## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NABIL (LAST NAME UNKNOWN),<br>      Detainee,<br>      Guantánamo Bay Naval Station<br>      Guantánamo Bay, Cuba; | ) )<br>)<br>)<br>)<br>) |
| JAMAAL KIYEMBA,<br>      as Next Friend of NABIL (LAST<br>      NAME UNKNOWN); | )<br>)<br>)<br>) |
| *Petitioners/Plaintiffs*, | )<br>) |
| v. | )<br>) |
| GEORGE W. BUSH,<br>      President of the United States<br>      The White House<br>      1600 Pennsylvania Ave., N.W.<br>      Washington, D.C. 20500; | )<br>)<br>)<br>)<br>)<br>) |
| DONALD RUMSFELD,<br>      Secretary, United States<br>      Department of Defense<br>      1000 Defense Pentagon<br>      Washington, D.C. 20301-1000; | )<br>)<br>)<br>)<br>)<br>) |
| ARMY BRIG. GEN. JAY HOOD,<br>      Commander, Joint Task Force - GTMO<br>      JTF-GTMO<br>      APO AE 09360; and | )<br>)<br>)<br>)<br>) |
| ARMY COL. MIKE BUMGARNER,<br>      Commander, Joint Detention<br>      Operations Group - JTF-GTMO,<br>      JTF-GTMO<br>      APO AE 09360, | )<br>)<br>)<br>)<br>)<br>) |
|      *Respondents/Defendants.* | ) |

CIVIL ACTION No.

_____

## PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Nabil (Last Name Unknown) ("Nabil") seeks a Writ of Habeas Corpus. A citizen of Algeria, he acts on his own behalf and through his Next Friend, Jamaal Kiyemba, his co-detainee and friend. He is a civilian wrongly classified as an "enemy combatant" by the President of the United States, and is being held virtually incommunicado in military custody at the United States Naval Station at Guantánamo Bay, Cuba ("Guantánamo Bay"), without basis, without charge, without access to counsel, and without being afforded any fair process by which he might challenge his detention. Petitioner Nabil is being held by color and authority of the Executive Branch, and in violation of the Constitution, laws and treaties of the United States as well as customary international law. Accordingly, this Court should issue a Writ of Habeas Corpus compelling Respondents either to release Petitioner Nabil or to establish in this Court a lawful basis for Petitioner Nabil's detention and provide related injunctive and declaratory relief.

Pursuant to the President's authority as Commander-in-Chief, his authority under the laws and usages of war, or under the November 13, 2001 Military Order, Respondents George W. Bush, President of the United States, Donald H. Rumsfeld, U.S. Secretary of Defense, Army Brigadier General Jay Hood, Commander of Joint Task Force-GTMO, and Army Colonel Mike Bumgarner, Commander, Joint Detention Operations Group, Joint Task Force-GTMO, are

2

either ultimately responsible for or have been charged with the responsibility of maintaining the custody and control of the detained Petitioner at Guantánamo Bay.

## SECTION I
## JURISDICTION AND VENUE

1.      Petitioners invoke the Court's jurisdiction under 28 U.S.C. §§ 2241(c)(1), (c)(3) and 2242.  Petitioners further invoke this Court's jurisdiction under: 28 U.S.C. §§ 1331, 1350, 1651, 2201, and 2202; 5 U.S.C. § 702; Articles I and II of the United States Constitution; and the Fifth, Sixth, and Eighth Amendments to the United States Constitution.  Petitioners also rely on Rule 57, Fed.R.Civ.P.

2.      This Court is empowered under 28 U.S.C. § 2241 to grant this Writ of Habeas Corpus, and to entertain the Petition filed by Jamaal Kiyemba, the Next Friend of Petitioner Nabil, under 28 U.S.C. § 2242.

3.      This Court is further empowered to declare the rights and other legal relations of the parties herein by 28 U.S.C. § 2201, and to effectuate and enforce declaratory relief by all necessary and proper means by 28 U.S.C. § 2202, as this case involves an actual controversy within the Court's jurisdiction, and to issue all writs necessary or appropriate in aid of its jurisdiction by 28 U.S.C. § 1651.

4.      Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391 because at least one of the respondents resides in the District, a substantial part of the events giving rise to the claim occurred in the District, at least one

respondent may be found in the District, and all respondents are either officers or employees of the United States, or agencies thereof, and acting in their official capacities.

## SECTION II
## PARTIES

5.    Petitioner Nabil is an Algerian citizen who is presently incarcerated at Guantánamo Bay and held in Respondents' unlawful custody and control. *See* attached Affidavit of Jamaal Kiyemba at ¶1.

6.    Petitioner Jamaal Kiyemba is Petitioner Nabil's co-detainee and friend. *Id*. at ¶1 and attachment.  He is an Algerian citizen.  Because his co-detainee and friend has been denied access to legal counsel and to the courts of the United States, Jamaal Kiyemba acts as his Next Friend, per 28 U.S.C. §§ 2241 and 2242. *Id*. at ¶1.

7.    Respondent George W. Bush is the President of the United States and Commander-in-Chief of the United States Military.  Petitioner Nabil is being detained pursuant to President Bush's authority as Commander-in-Chief, under the laws and usages of war or, alternatively, pursuant to the Military Order of November 13, 2001: "Detention, Treatment, and Trial of Certain Non-Citizens in the War Against Terrorism," 66 Fed. Reg. 57,833 (November 13, 2001) ("Military Order").  President Bush is responsible for Petitioner Nabil's unlawful detention and is sued in his official capacity.

8.    Respondent Donald Rumsfeld is the Secretary of the United States Department of Defense.  Pursuant to the President's authority as Commander-in-Chief, under the laws and usages of war or, alternatively, pursuant to Sec. 3 of the Military Order, Respondent Rumsfeld has been charged with the responsibility of maintaining the custody and control of Petitioner Nabil.  He is sued in his official capacity.

9.    Respondent Brigadier General Jay Hood is the Commander of Joint Task Force - GTMO, the task force running the detention operation at Guantánamo Bay.  He has supervisory responsibility for Petitioner Nabil and is sued in his official capacity.

10.    Respondent Army Colonel Mike Bumgarner is the Commander of the Joint Detention Operations Group and the Joint Task Force - GTMO detention camps, including the U.S. facility where Petitioner Nabil is presently held.  He is the immediate custodian responsible for Petitioner Nabil's detention and is sued in his official capacity.

11.    Respondents are directly responsible for any activities undertaken by or under the supervision of any agents or employees acting on their behalf, or of agents or employees of private contractors ("contractor employees") with whom any agency under Respondents' authority or supervision has contracted for the provision of services at Guantánamo Bay.  All references to Respondents' actions

in this Petition include activities performed by Respondents' agents or employees, other government agents or employees or contractor employees.

## SECTION III
## STATEMENT OF FACTS

### § III(A).  FACTS ASSERTED CONCERNING PETITIONER NABIL BASED ON INFORMATION AND BELIEF

12.     Petitioner Nabil has been and continues to be detained in U.S. custody at the U.S. Naval Base at Guantánamo Bay.

13.     Guantánamo Bay is a territory over which the United States exercises exclusive jurisdiction and control.

14.     Upon information and belief, Petitioner Nabil desires to pursue in United States courts every available legal challenge to the lawfulness of his detention.  Petitioner Nabil has been denied access to counsel by Respondents, and accordingly, this and subsequent allegations of fact that pertain to Petitioner Nabil are based on information and belief.

15.     Petitioner Nabil is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind under any definition adopted by the government in any civil or military proceeding.

16.     Petitioner Nabil has never been engaged in any combat against the United States and was never part of any forces hostile to the United States.

17.     Petitioner Nabil is not, nor has he ever been, an individual who was part of or supporting Taliban forces or partners.

6

18.    Petitioner Nabil is not, nor has he ever been, an individual who was part of or supporting al Qaeda forces or partners.

19.    Petitioner Nabil has not committed a belligerent act nor directly supported hostilities in aid of enemy forces against the United States.

20.    Petitioner Nabil has not caused or attempted to cause any harm to American personnel or property prior to his detention or espouse any violent act against any American person or property.

21.    Petitioner Nabil has not engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefore, that have caused, threatened to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy.

22.    Petitioner Nabil has not knowingly harbored one or more individuals who is or were a member of the al Qaeda organization.

23.    Petitioner Nabil has not knowingly harbored one or more individuals who were engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefore, that have caused, threatened to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy.

24.    Petitioner Nabil has not been afforded any procedures that would satisfy his rights under the most fundamental common law notions of due process,

7

the U.S. Constitution, the laws and treaties of the United States, or customary international law.

25.    Petitioner Nabil is not, nor has he ever been, an "enemy combatant" who was "part of or supporting forces hostile to the United States or coalition partners in Afghanistan and who engaged in an armed conflict against the United States there." *Hamdi v. Rumsfeld*, 124 S.Ct. 2633, 2639 (June 28, 2004) (internal quotations omitted).

26.    Petitioner Nabil is not, nor has he ever been, an "enemy combatant" as that term is used pursuant to the 7 July 2004 Order of Deputy Secretary of Defense Paul Wolfowitz, establishing the Combatant Status Review Tribunals.

27.    Petitioner Nabil seeks to enforce his right to a judicial determination by an appropriate and lawful authority that there is a factual and legal basis for Respondents' determination that he is either an "enemy combatant" as defined by the United States Supreme Court in *Hamdi* or an "enemy combatant" as that term is defined and used by the Executive in the Combatant Status Review Tribunals.

28.    Petitioner Nabil is entitled to test the legality of his continued detention at Guantánamo Bay in the federal courts. *Rasul v. Bush*, 124 S.Ct. 2686, 2698 (2004).

29.    There is no interest of the United States that is served by further detention of Petitioner Nabil at Guantánamo Bay.

### § III (B). THE JOINT RESOLUTION
### ("AUTHORIZATION FOR USE OF MILITARY FORCE")

30.    In the wake of the September 11, 2001 attacks on the United States, the United States, at the direction of President Bush, began a military campaign against the Taliban government, then in power in Afghanistan.

31.    On September 18, 2001, Congress passed and the President signed a joint resolution, the "Authorization for Use of Military Force" (the "AUMF"). The AUMF authorized the President to:

> [U]se all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations, or persons.

Joint Resolution 23, Authorization for Use of Military Force, Public Law 107-40, 115 Stat. 224 (Sept. 18, 2001)("Joint Resolution" a/k/a the "AUMF").

32.    Prior to his detention at Guantánamo Bay, Petitioner Nabil did not plan, authorize, commit, or aid the terrorist attacks that occurred on September 11, 2001.

33.    Prior to his detention at Guantánamo Bay, Petitioner Nabil did not belong to an organization that did plan, authorize, commit, or aid the terrorist attacks that occurred on September 11, 2001.

9

34.     Prior to his detention at Guantánamo Bay, Petitioner Nabil did not harbor any organization or person who did plan, authorize, commit, or aid the terrorist attacks that occurred on September 11, 2001.

35.     Petitioner Nabil is, therefore, not properly detained pursuant to President Bush's authority as Commander-in-Chief under the Joint Resolution.

### § III (C).  MILITARY ORDER NO. 1.

36.     On November 13, 2001, Respondent Bush issued Military Order No. 1. *See* Military Order, 66 Fed. Reg. 57,833 (Nov. 13, 2001) ("Military Order").

37.     The Military Order authorizes Respondent Rumsfeld, *inter alia*, to detain indefinitely "any individual who is not a United States citizen with respect to whom [Respondent Bush] determine[s] from time to time in writing that:

(1)     there is reason to believe that such individual, at the relevant times,

    i.      is or was a member of the organization known as al Qaida;

    ii.     has engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefor, that have caused, threaten to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy; or

    iii.    has knowingly harbored one or more individuals described in subparagraphs (i) or (ii) of subsection 2(a)(1) of this order; and

(2)     it is in the interest of the United States that such individual be subject to this order.

Military Order, §2(a).

38.    The Military Order requires that "[Respondent Rumsfeld] shall take all necessary measures to ensure that any individual subject to this order is detained in accordance with section 3 ...." Military Order, § 2(b).

39.    The Military Order requires that "[a]ny individual subject to this order shall be ... (b) treated humanely, without any adverse distinction based on race, color, religion, gender, birth, wealth, or any similar criteria ...." Military Order, § 3(b).

40.    The Military Order exceeds the Executive's authority under Article II of the United States Constitution and is *ultra vires* and void on its face.

41.    The Military Order was neither authorized nor directed by Congress, and is, therefore, beyond the scope of the Joint Resolution of September 18, 2001.

42.    The Military Order purports to vest President Bush with the sole discretion to identify individuals who fall within its purview. *See id.*, § 2(a).

43.    The Military Order establishes no standards governing the exercise of President Bush's discretion to identify individuals who fall within its purview.

44.    The Military Order contains no provision for an individual who has been detained to be notified of the charges he may face.

45.    The Military Order contains no provision for an individual who has been detained to be notified of his rights under domestic and international law,

and provides neither the right to counsel, nor the rights to notice of consular protection or to consular access at the detainee's request.

46.    The Military Order provides no right for an individual who has been detained to appear before a neutral tribunal to review the legality of a detainee's continued detention, contains no provision for recourse to an Article III court, and, moreover, expressly bars review by (i) any court of the United States, (ii) any court of any foreign nation, or (iii) any international tribunal. *See id.*, § 7(b)(2).

47.    The Military Order authorizes detainees to be confined indefinitely without charges.

48.    The Military Order authorizes indefinite and unreviewable detention, based on nothing more than the President Bush's written determination that an individual is subject to its terms.

49.    The Military Order was promulgated in the United States and in this judicial district; the decision to detain Petitioner Nabil was made by Respondents in the United States and in this judicial district; the decision to detain Petitioner Nabil at Guantánamo was made in the United States and in this judicial district; and the decision to continue detaining Petitioner Nabil was, and continues to be, made by Respondents in the United States and in this judicial district.

50.    Petitioner Nabil has not been, and is not being, detained lawfully either pursuant to the Military Order, President Bush's authority as Commander-in-Chief and/or under the laws and usages of war.

### § III (D).   PETITIONER NABIL'S CONTINUED DETENTION VIOLATES § 2(A) OF THE MILITARY ORDER

51.    To the extent the Military Order is not facially *ultra vires*, the detention of Petitioner Nabil continues in violation of the express provisions of the Military Order.

52.    Petitioner Nabil is not properly subject to the Military Order.  No writing otherwise required by the Military Order was issued as to Petitioner Nabil.

53.    Petitioner Nabil has not been, and is not being, detained lawfully pursuant to the Military Order.

54.    Petitioner Nabil is not, nor has he ever been, an individual who was a member of the organization known as al Qaeda or al Qaida.

55.    Petitioner Nabil has not engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefore, that have caused, threatened to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy.

56.    Petitioner Nabil has not knowingly harbored one or more individuals who is or were a member of the al Qaeda organization.

57.    Petitioner Nabil has not knowingly harbored one or more individuals who were engaged in, aided or abetted, or conspired to commit, acts of international terrorism, or acts in preparation therefore, that have caused, threatened to cause, or have as their aim to cause, injury to or adverse effects on the United States, its citizens, national security, foreign policy, or economy.

58.    There is no interest of the United States that is served by further detention of Petitioner Nabil at Guantánamo Bay.

59.    Petitioner Nabil is entitled to test the legality of his continued detention under circumstances that violate Section 2(a) of the Military Order in the federal courts. *Rasul v. Bush*, 124 S.Ct. 2686, 2698 (2004).

### § III (E).  THE CONDITIONS OF DETENTION AT GUANTÁNAMO VIOLATE § 3(B) OF THE MILITARY ORDER

60.    Upon information and belief, Petitioner Nabil is not being treated humanely as required by Military Order, § 3(b).

61.    On or about January 11, 2002, the United States military began transporting prisoners captured in Afghanistan to Camp X-Ray at the United States Naval Base in Guantánamo Bay, Cuba.

62.    In April 2002, all prisoners at Guantánamo Bay were transferred to Camp Delta, a more permanent prison facility at Guantánamo Bay.

63.    Certain prisoners at Guantánamo Bay are housed in Camp Delta and Camp Five, an additional maximum-security interrogation and detention center.

64.    The United States military transferred Petitioner Nabil to Guantánamo Bay, where he has been held ever since, in the custody and control of Respondents.

65.    Since gaining control of Petitioner Nabil, the United States military has held him virtually *incommunicado*.

66.    Upon information and belief, Petitioner Nabil has been or will be forced to provide involuntary statements to Respondents' agents, employees, and/or contract employees at Guantánamo Bay.

67.    Upon information and belief, Petitioner Nabil has been or will be interrogated repeatedly by agents of the United States Departments of Defense and Justice, and the Central Intelligence Agency, though he has not been charged with an offense and has not been notified of any pending or contemplated charges.

68.    Upon information and belief, Petitioner Nabil has not appeared before a lawful military or civilian tribunal, and has not been provided access to counsel or the means to contact and secure counsel.

69.    Upon information and belief, Petitioner Nabil has not been adequately informed of his rights under the United States Constitution, the regulations of the United States Military, the Geneva Conventions, the International Covenant on Civil and Political Rights, the American Declaration on the Rights and Duties of Man, the 1954 Convention Relating to the Status of

Refugees or customary international law. Indeed, Respondents have taken the position that Petitioner Nabil should not be informed of these rights. As a result, Petitioner Nabil lacks any ability to protect or to vindicate his rights under domestic and international law.

70.    Upon information and belief, Petitioner Nabil has been treated inhumanely and held under conditions that violate his constitutional and international rights to dignity and freedom from torture and from cruel, inhumane and degrading treatment or punishment. *See, e.g.*:

(a)    Amnesty International, "Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power," at 83-115, Ch.12-13, AMR 51/063/2005 (13 May 2005);

(b)    Physicians for Human Rights, "Break Them Down: Systematic Use of Psychological Torture by US Forces," Ch.3 (2005)

(c)    United Nations, Press Release, "United Nations Human Rights Experts Express Continued Concern About Situation of Guantánamo Bay Detainees," Feb. 4, 2005;

(d)    International Committee of the Red Cross, Press Release, "The ICRC's Work at Guantánamo Bay," Nov. 30, 2004;

(e)    International Committee of the Red Cross, Operational Update, "US Detention Related to the Events of September 11, 2001 and Its Aftermath - the Role of the ICRC," July 26, 2004;

(f)    Amnesty International, *United States of America: Human Dignity Denied: Torture and Accountability in the 'War on Terror'*, at 22 (Oct. 27, 2004)(available at http://web.amnesty.org/library/Index/ENGAMR 511452004); *see also*

(g)    Barry C. Scheck, *Abuse of Detainees at Guantánamo Bay*, The Nat'l Assoc. of Criminal Defense Lawyers' Champion, Nov. 2004, at 4-5.

71.    Many of the violations reported in the sources in the preceding

paragraph – which include isolation for up to 30 days, 28-hour interrogations,

extreme and prolonged stress positions, sleep deprivation, sensory assaults,

removal of clothing, hooding, and the use of dogs to create anxiety and terror –

were interrogation techniques approved for use at Guantánamo by the most senior

Department of Defense lawyer. *See, e.g.*:

(a)    Action Memo from William J. Haynes II, General Counsel,
       DOD, to Secretary of Defense (Nov. 27, 2002);

(b)    *Pentagon Working Group Report on Detainee Interrogations
       in the Global War on Terrorism: Assessment of Legal,
       Historical, Policy and Operational Considerations*, at 62-65
       (Apr. 4, 2003).[a]

72.    In a confidential report to the United States government, the ICRC

charged the U.S. military with intentional use of psychological and physical

coercion on prisoners at Guantánamo Bay during interrogations that is

"tantamount to torture." *See, e.g.*:

(a)    Neil A. Lewis, "Red Cross Finds Detainee Abuse in
       Guantánamo," *New York Times*, Nov. 30, 2004, at A1

---

[a]  Additional details of the cruel and degrading conditions suffered by detainees
at Guantánamo Bay are set out at length in a statement by numerous released
British detainees. *See* Shafiq Rasul, Asif Iqbal & Rhuhel Ahmed, *Composite
Statement: Detention in Afghanistan and Guantánamo Bay*, 300, *at*
http://www.ccr-ny.org/v2/reports/docs/Gitmo-
compositestatementFINAL23july04.pdf). The Department of Defense also
informed the Associated Press that a number of interrogators at Guantánamo Bay
have been demoted or reprimanded after investigations into accusations of abuse
at the facility. *See Report Details Guantánamo Abuses*, Assoc. Press, Nov. 4,
2004.

(including claims that doctors and other medical workers at Guantánamo Bay participated in planning for interrogations); *see also*

(b)   M. Gregg Bloche and Jonathan H. Marks, "When Doctors Go to War," *New England Journal of Medicine*, Jan. 6, 2005, at 3-4.

73.   Since details of the ICRC's report emerged, new revelations of abuse and torture at Guantánamo Bay have appeared, including FBI memos detailing torture and "highly aggressive interrogation techniques" including 24-plus hour interrogations involving temperature extremes, dogs, prolonged isolation, and loud music. *See, e.g.*:

(a)   Amnesty International, "Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power," at 83-115, Ch.12-13, AMR 51/063/2005 (13 May 2005);

(b)   Amnesty International, "Guantánamo: An Icon of Lawlessness," Jan. 6, 2005, at 3-5; *see also*

(c)   Physicians for Human Rights, "Break Them Down: Systematic Use of Psychological Torture by US Forces," Ch.3 (2005);

(d)   Neil A. Lewis, "Fresh Details Emerge on Harsh Methods at Guantánamo," *New York Times*, Jan. 1, 2005, at A11;

(e)   Carol D. Leonnig, "Further Detainee Abuse Alleged; Guantánamo Prison Cited in FBI Memos," *Washington Post*, Dec. 26, 2004, at A1;

(f)   Neil A. Lewis and David Johnston, "New F.B.I. Memos Describe Abuses of Iraq Inmates," *New York Times*, Dec. 21, 2004, at A1;

(g)   Dan Eggen and R. Jeffrey Smith, "FBI Agents Allege Abuse of Detainees at Guantánamo Bay," *Washington Post*, Dec. 21, 2004, at A1;

(h)   Neil A. Lewis, "F.B.I. Memos Criticized Practices at Guantánamo," *New York Times*, Dec. 7, 2004, at A19.

74.    Even more recently, the Associated Press has reported allegations that female Guantánamo interrogators have used sexual taunting, including smearing fake menstrual blood on a detainee's face, to try to break Muslim detainees. *See, e.g.*:

    (a)    Amnesty International, "Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power," at 89-90, Ch.12, AMR 51/063/2005 (13 May 2005);

    (b)    Associated Press, *Gitmo Soldier Details Sexual Tactics*, Jan. 27, 2005;

75.    The unlawful and unconstitutional interrogation techniques used by Respondents at Guantánamo include not only physical and psychological abuse, but also other impermissible conduct contrary to due process requirements, including, upon information and belief, having agents of the Government present themselves as lawyers for the detainees during meetings with the detainees, for the purpose of extracting information from the detainees. *See, e.g.*: Sam Hannel, "Lawyers Describe Guantánamo Detainees," *Seattle Post-Intelligencer*, Jan. 19, 2005.

76.    Respondents, acting individually or through their agents, have stated that whatever limitations apply on coercive interrogation techniques used by U.S. military officials under the auspices of the Department of Defense *do not apply* to interrogations conducted by agents of the CIA or other entities under President Bush. *See, e.g.*:

(a)    Eric Lichtblau, "Gonzales Says '02 Policy on Detainees Doesn't Bind CIA," *New York Times*, Jan. 19, 2005, at A17;

(b)    Dan Eggen and Charles Babington, "Torture by U.S. Personnel Illegal, Gonzales Tells Senate," *Washington Post*, Jan. 18, 2005, at A4; and

(c)    Amnesty International, "Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power," at 27-43, Ch.5, AMR 51/063/2005 (13 May 2005).

77.    In published statements, President Bush and Secretary Rumsfeld, and predecessors of Hood and Bumgarner, respectively, Brigadier General Michael Lenhert and Army Colonel Terry Carrico, have proclaimed that the United States may hold the detainees under their current conditions indefinitely. *See, e.g.,*

(a)    Roland Watson, *The Times* (London), Jan. 18, 2002 ("Donald Rumsfeld, the U.S. Defense Secretary, suggested last night that Al-Qaeda prisoners could be held indefinitely at the base. He said that the detention of some would be open-ended as the United States tried to build a case against them.");

(b)    Lynne Sladky, Assoc. Press, Jan. 22, 2002 ("Marine Brig. Gen. Mike Lehnert, who is in charge of the detention mission, defended the temporary cells where detainees are being held …. 'We have to look at Camp X-ray as a work in progress …' Lehnert told CNN. Lehnert said plans are to build a more permanent prison 'exactly in accordance with federal prison standards ….");

(c)    John Mintz, "Extended Detention in Cuba Mulled," *The Washington Post*, February 13, 2002 ("As the Bush Administration nears completion of new rules for conducting military trials of foreign detainees, U.S. officials say they envision the naval base at Guantánamo Bay, Cuba, as a site for the tribunals and as a terrorist penal colony for many years to come.").

78. According to the Department of Defense, even detainees who are adjudged not guilty of all charges by a military commission may nevertheless be kept in detention at Guantánamo Bay indefinitely. *See* Department of Defense Press Background Briefing of July 3, 2003, *at* http://www.defenselink.mil/transcripts/2003/tr20030703-0323.html (last visited Jun. 4, 2005).

79. Counsel for Respondents have also consistently maintained that the United States has reserved the right to hold the detained Petitioners under their current conditions indefinitely. *See, e.g.*:

    (a)    *In re Guantánamo Detainee Cases*, Nos. 02-CV-0299 (CKK), *et al.*, (D.D.C.), Tr. of Dec. 1, 2004 Or. Argument on Mot. to Dismiss at 22-24, statements of Principle Deputy Associate Att'y Gen. Brian Boyle; *see also*

    (b)    Dana Priest, "Long-Term Plan Sought for Terror Suspects," *Wash. Post*, Jan. 2, 2005, at A1.

80. Moreover, the Government has recently acknowledged plans to begin constructing a new, more permanent facility at Guantánamo Bay. *See, e.g.*:

    (a)    Christopher Cooper, "In Guantánamo, Prisoners Languish in a Sea of Red Tape," *Wall Street Journal*, Jan. 26, 2005, at A1;

    (b)    Associated Press, "Guantánamo Takes on the Look of Permanency," Jan. 9, 2005.

81. Petitioner Nabil is entitled to test the legality of his continued detention under circumstances that violate Section 3(b) of the Military Order in the federal courts. *Rasul v. Bush*, 124 S.Ct. 2686, 2698 (2004).

82.    These and other acts violate the first clause of Section 3(b) of the
Military Order.  Petitioner Nabil has suffered discriminatory treatment in
violation of the second clause of Section 3(b) of the Military Order.  This
discriminatory and illegal treatment resulted from abuse of the Koran by agents
of Respondents and other inhumane treatment aimed at the religious beliefs of
Petitioner Nabil.  *See, e.g.*:

   (a)    Statement by Pentagon Spokesman Mr. Lawrence Di Rita on
          BG Hood Inquiry, No. 557-05, June 3, 2005;

   (b)    U.S. Southern Command Press Release, "Hood Completes
          Koran Inquiry," June 3, 2005;

   (c)    Carol Leonnig and Dana Priest, "Detainees Accuse Female
          Interrogators," Washington Post, at A01, Feb. 10, 2005.

83.    Petitioner Nabil has otherwise suffered discriminatory inhumane
treatment based on his country or origin, nationality, and religion.  Respondents
have released nearly 100 percent of detainees who were citizens of Australia or
most European countries, regardless of their circumstances of capture or alleged
terrorists activities.  *See, e.g.*, Department of Defense Press Release, dated March
7 and 12, 2005 (Nos. 236-05 and 249-05).  Only a small fraction of detainees
from other regions of the world have been released.  No Algerians are believed to
have been released.  *See id.*  This discriminatory treatment violates the second
clause of Military Order Section 3(b) and further constitutes inhumane treatment
in violation of that order.

### § III (F).  RENDITION OF PRISONERS OR THE THREAT THEREOF VIOLATES THE MILITARY ORDER AND IS *ULTRA VIRES* AND UNLAWFUL

84.    Upon information and belief, Petitioner Nabil is subject to extraordinary rendition to a government who condones torture or the threat thereof.

85.    During interrogations, detainees have been threatened with rendition or transfer to countries that routinely practice torture.  Upon information and belief, the United States has secretly transferred detainees to such countries without complying with the applicable legal requirements for extradition.  This practice, known as "rendition" or "extraordinary rendition," is used to facilitate interrogation by subjecting detainees to torture.  *See e.g.*:

    (a)    Amnesty International, "Guantánamo and Beyond: The Continuing Pursuit of Unchecked Executive Power," at 130-36, Ch.15, AMR 51/063/2005 (13 May 2005); and

    (b)    Jane Mayer, "Outsourcing Torture:  The Secret History of American's "Extraordinary Rendition" Program, *The New Yorker,* Feb. 14, 2005, at 106.

86.    The U.S. government's practice of rendition has been well documented by various major American and international news organizations, including, *inter alia,* the *Washington Post, The Los Angeles Times,* and the British Broadcasting Corporation (the "BBC").  According to news accounts,

Since September 11, the U.S. government has secretly transported dozens of people suspected of links to terrorists to countries other than the United States bypassing extradition procedures and legal formalities, according to Western diplomats and intelligence source.

> The suspects have been taken to countries, . . . whose intelligence services have close ties to the CIA and where they can be subjected to interrogation tactics – including torture and threats to families – that are illegal in the United States, the sources said. In some cases, U.S. intelligence agents remain closely involved in the interrogations, the sources said.

Rajiv Chanrasekaran & Peter Finn, "U.S. Behind Secret Transfer of Terror Suspects," *Wash. Post,* March 11, 2002, at A1; *see also* Dana Priest, "Long Term Plan Sought for Terror Suspects," *Wash. Post,* Jan 2, 2005, at A1 ("The transfers, called 'renditions,' depend on arrangements between the United States and other countries, such as Egypt . . ., and agree to have local security services hold certain suspects in their facilities for interrogation by CIA and foreign liaison officers.");

87.    The Military Order does not grant authority to the Secretary of Defense or any other agent of Respondents to render any individual subject to the Military Order to a foreign government for any purpose whatsoever. Actual rendition, therefore, is *ultra vires* and illegal. Further, rendition of persons subject to the Military Order or the threat thereof violates Section 3(b) of the Military Order and is illegal.

88.    Rendition of individuals subject to the Military Order exceeds the Executive's authority under Article II of the United States Constitution and is *ultra vires* and unlawful.

### § III (G).  THE CONDITIONS OF DETENTION AT GUANTÁNAMO, INCLUDING THE THREAT OF RENDITION, VIOLATE H.R. 1268.

89.     Recently passed H.R. 1268, "Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005," Public Law No: 109-13, includes Section 1031, entitled: "Prohibition on Torture and Cruel, Inhuman, or Degrading Treatment."

90.     Section 1031 of H.R. 1268, provides:

(a)(1) None of the funds appropriated or otherwise made available by this Act shall be obligated or expended to subject any person in the custody or under the physical control of the United States to torture or cruel, inhuman, or degrading treatment or punishment that is prohibited by the Constitution, laws, or treaties of the United States.

(2) Nothing in this section shall affect the status of any person under the Geneva Conventions or whether any person is entitled to the protections of the Geneva Conventions.

(b) As used in this section –

(1) the term 'torture' has the meaning given that term in section 2340(1) of title 18, United States Code; and

(2) the term 'cruel, inhuman, or degrading treatment or punishment' means the cruel, unusual, and inhumane treatment or punishment prohibited by the fifth amendment, eighth amendment, or fourteenth amendment to the Constitution of the United States.

91.     Sections 2340(1)-(3) of Title 18, United States Code, provides:

As used in this chapter –

(1)     "torture" means an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering

25

incidental to lawful sanctions) upon another person within his custody or physical control;

(2)  "severe mental pain or suffering" means the prolonged mental harm caused by or resulting from -

(A)  the intentional infliction or threatened infliction of severe physical pain or suffering; the administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt profoundly the senses or the personality;

(B)  the threat of imminent death; or

(C)  the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind-altering substances or other procedures calculated to disrupt profoundly the senses or personality; and

(3)  "United States" includes all areas under the jurisdiction of the United States including any of the places described in sections 5 and 7 of this title and section 46501(2) of title 49.

92.  As set forth above, upon information and belief, detainees have been and continue to be treated inhumanely and held under conditions that violate their constitutional and international rights to dignity and freedom from torture and from cruel, inhumane and degrading treatment or punishment, all of which occur in violation of Section 1031.

93.  As set forth above, upon information or belief, detainees have endured or continue to endure or be threatened with isolation for up to 30 days, 28-hour interrogations, extreme and prolonged stress positions, sleep deprivation, sensory assaults, removal of clothing, hooding, and the use of dogs to create anxiety and terror, each of which were interrogation techniques approved for use

at Guantánamo Bay by the most senior Department of Defense lawyer, and all of which occur in violation of Section 1031.

94.    As set forth above, upon information or belief, detainees have been or are subject to or are threatened with psychological and physical coercion during interrogations that is "tantamount to torture," all of which occur in violation of Section 1031.

95.    As set forth above, upon information or belief, detainees have been, continue to be or are threatened with "highly aggressive interrogation techniques" including 24-plus hour interrogations involving temperature extremes, dogs, prolonged isolation, and loud music, all of which occur in violation of Section 1031.

96.    As set forth above, upon information or belief, detainees have been, continue to be or are threatened with sexual taunting, including smearing fake menstrual blood on a detainee's face, all of which occur in violation of Section 1031.

97.    As set forth above, upon information or belief, during interrogations, detainees have been threatened with rendition or transfer to countries that routinely practice torture and, moreover, the United States has secretly transferred detainees to such countries without complying with the applicable legal requirements for extradition, which occurs in violation of Section 1031.

98.    The foregoing occurrences amount to torture, as that term is defined in 18 U.S.C. § 2340(1), including the intentional infliction of severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon detainees.

99.    The foregoing occurrences amount to cruel, inhuman, or degrading treatment or punishment that is prohibited by the Constitution, laws, or treaties of the United States.

100.   The foregoing occurrences amount to violations of Section 1031, thereby entitling Petitioner Nabil to injunctive relief, including an injunction from this Court enjoining Respondents from further obligating or expending funds appropriated under HR 1268 for the construction, maintenance or operation of prisons, camps or other facilities at Guantánamo Bay.

## SECTION IV
## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (COMMON LAW DUE PROCESS AND DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND THE MILITARY ORDER: UNLAWFUL DEPRIVATION OF LIBERTY AND INHUMANE TREATMENT)

101.   Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

102.   By the actions described above, Respondents, acting under color of law, have violated and continue to violate common law principles of due process as well as the Due Process Clause of the Fifth Amendment to the Constitution of

the United States. President Bush has ordered the prolonged, indefinite, and arbitrary detention of individuals, without due process of law, and the remaining Respondents have implemented those orders. Respondents' actions deny Petitioner Nabil the process accorded to persons seized and detained by the United States military in times of armed conflict as established by, *inter alia*, the Uniform Code of Military Justice, Army Regulation 190 - 8, Articles 3 and 5 of the Third and Fourth Geneva Conventions, and customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

103. To the extent that Petitioner Nabil's detention purports to be authorized by the Military Order, that Order violates the Fifth Amendment on its face and as applied to Petitioner.

104. These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

105. Accordingly, Petitioner Nabil is entitled to a writ of habeas corpus, and to necessarily related declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## SECOND CLAIM FOR RELIEF
### (DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES: UNLAWFUL CONDITIONS OF CONFINEMENT)

106.   Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

107.   By the actions described above, Respondents, acting under color of law, have violated and continue to violate the right of Petitioner Nabil to be free from unlawful conditions of confinement, in violation of the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

108.   Accordingly, Petitioner Nabil is entitled to declaratory and injunctive relief as well as any other relief the court may deem appropriate.

## THIRD CLAIM FOR RELIEF
### (GENEVA CONVENTIONS AND THE MILITARY ORDER: ARBITRARY DENIAL OF DUE PROCESS AND INHUMANE TREATMENT)

109.   Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

110.   By the actions described above, Respondents, acting under color of law, have denied and continue to deny Petitioner Nabil the process accorded to persons seized and detained by the United States military in times of armed conflict as established by specific provisions of the Third and Fourth Geneva Conventions.

111.   Violations of the Geneva Conventions are direct treaty violations, are violations of customary international law, and constitute an enforceable claim under 28 U.S.C. § 2241 (c)(3).

112.   Respondents are liable for this conduct described above, insofar as they set the conditions, directly and/or indirectly facilitated, ordered, acquiesced, confirmed, ratified, and/or conspired to violate the Geneva Conventions.

113.   These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

114.   Accordingly, Petitioner Nabil is entitled to a writ of habeas corpus and to necessarily related declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### FOURTH CLAIM FOR RELIEF
### (INTERNATIONAL HUMANITARIAN AND HUMAN RIGHTS LAW AND THE MILITARY ORDER: ARBITRARY DENIAL OF DUE PROCESS AND INHUMANE TREATMENT)

115.   Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

116.   By the actions described above, Respondents have denied and continue to deny Petitioner Nabil the due process accorded to persons seized and detained by the United States military in times of armed conflict as establish by customary international humanitarian and human rights law as reflected,

expressed, and defined in multilateral treaties and other international instruments and domestic judicial decisions, and other authorities.

117.    These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

118.    Accordingly, Petitioner Nabil is entitled to a writ of habeas corpus and to necessarily related declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### FIFTH CLAIM FOR RELIEF
#### (ALIEN TORT STATUTE AND THE MILITARY ORDER: TORTURE (INHUMANE TREATMENT))

119.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

120.    By the actions described above, the Respondents directed, ordered, confirmed, ratified, and/or conspired to bring about acts that deliberately and intentionally inflicted severe physical and/or psychological abuse and/or agony upon Petitioner Nabil in order to obtain coerced information or confessions from him, punish or intimidate Petitioner Nabil or for other purposes.  Among other abuses, Petitioner Nabil has been held in conditions of isolation; placed in constant vulnerability to repeated interrogation and severe beatings; kept in cages with no privacy; shackled with heavy chains and irons; placed in solitary confinement for minor rule infractions for prolonged periods of time; interrogated

while shackled and chained in painful positions; exposed to extremes of temperature; subjected to violent behavior or the threat of violence; threatened with rendition to countries that practice torture; sexually humiliated; denied access to counsel and family; deprived of adequate medical care; and/or subjected to repeated psychological abuse.

121.    The acts described herein constitute torture in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. §1350, in that the acts violated customary international law prohibiting torture as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

122.    These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

123.    Respondents are liable for said conduct because they directed, ordered, confirmed, ratified, and/or conspired together and with others to commit the acts of torture against Petitioner Nabil.

124.    Petitioner Nabil was forced to suffer severe physical and/or psychological abuse and agony and is therefore entitled to a writ of habeas corpus and to necessarily related declaratory and injunctive relief, and such other relief as the court may deem appropriate.

### SIXTH CLAIM FOR RELIEF
### (ALIEN TORT STATUTE AND THE MILITARY ORDER: WAR CRIMES (INHUMANE TREATMENT))

125. Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

126. By the actions described above, Respondents' acts directing, ordering, confirming, ratifying, and/or conspiring to bring about the torture and other inhumane treatment of Petitioner Nabil constitute war crimes and/or crimes against humanity in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated, among others, the Fourth Geneva Convention, Common Article III of the Geneva Conventions and Additional Protocols I and II of the Geneva Conventions as well as customary international law prohibiting war crimes as reflected, expressed, and defined in other multilateral treaties and international instruments, international and domestic judicial decision, and other authorities.

127. These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

128. As a result of Respondents' unlawful conduct, Petitioner Nabil has been and is forced to suffer severe physical and/or psychological abuse and agony, and is therefore entitled to a writ of habeas corpus and to necessarily

related declaratory and injunctive relief, and such other relief as the court may deem appropriate.

### SEVENTH CLAIM FOR RELIEF
### (ALIEN TORT STATUTE AND THE MILITARY ORDER: CRUEL, INHUMANE OR DEGRADING TREATMENT)

129.   Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

130.   The acts described herein had the intent and the effect of grossly humiliating and debasing Petitioner Nabil, forcing him to act against his will and conscience, inciting fear and anguish, and breaking his physical or moral resistance.

131.   The acts described herein constitute cruel, inhumane or degrading treatment in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting cruel, inhumane or degrading treatment as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

132.   These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

133.  Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to cause the cruel, inhumane or degrading treatment of Petitioner Nabil.

134.  Petitioner Nabil was forced to suffer severe physical and/or psychological abuse and agony and is entitled to a writ of habeas corpus, and to necessarily related declaratory and injunctive relief, as well as other relief to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
### (ALIEN TORT STATUTE AND THE MILITARY ORDER: ARBITRARY ARREST AND PROLONGED ARBITRARY DETENTION (INHUMANE TREATMENT))

135.  Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

136.  The acts described herein constitute arbitrary arrest and detention of Petitioner Nabil in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

137.  Respondents are liable for said conduct in that they directed, ordered, confirmed, ratified, and/or conspired together and with others to bring about the arbitrary arrest and prolonged arbitrary detention of Petitioner Nabil in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in

that the acts violated customary international law prohibiting arbitrary arrest and prolonged arbitrary detention as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

138.    These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

139.    As a result of Respondents' unlawful conduct, Petitioner Nabil has been and is deprived of his freedom, separated from his family, and forced to suffer severe physical and mental abuse, and is therefore entitled to a writ of habeas corpus, and to necessarily related declaratory and injunctive relief, and such other relief as the court may deem appropriate.

### NINTH CLAIM FOR RELIEF
### (ALIEN TORT STATUTE AND THE MILITARY ORDER: ENFORCED DISAPPEARANCE (INHUMANE TREATMENT))

140.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

141.    By the actions described above, the Respondents directed, ordered, confirmed, ratified, and/or conspired to bring about the enforced disappearance of Petitioner Nabil in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting enforced disappearances as reflected, expressed, and defined in multilateral

treaties and other international instruments, international and domestic judicial decisions, and other authorities.

142.    These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

143.    As a result of Respondents' unlawful conduct, Petitioner Nabil has been and is deprived of his freedom, separated from his family, and forced to suffer severe physical and mental abuse, and is therefore entitled to necessarily related declaratory and injunctive relief and such other relief as the court may deem appropriate.

## TENTH CLAIM FOR RELIEF
### (ARTICLE II OF THE UNITED STATES CONSTITUTION: UNLAWFUL DETENTION)

144.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

145.    Petitioner Nabil is not, nor has he ever been, an enemy alien, lawful or unlawful belligerent, or combatant of any kind.  The Executive lacks the authority to order or direct military officials to detain civilians who are seized far from the theater of war or occupied territory or who were not "carrying a weapon against American troops on a foreign battlefield." *Hamdi v. Rumsfeld*, 124 S.Ct. 2633, 2642 n.1 (2004).

146.  By the actions described above, President Bush has exceeded and continues to exceed the Executive's authority under Article II of the United States Constitution by authorizing, ordering and directing that military officials seize Petitioner Nabil and transfer him to military detention, and by authorizing and ordering their continued military detention at Guantánamo Bay.  All of the Respondents acted and continue to act without lawful authority by directing, ordering, and/or supervising the seizure and military detention of Petitioner Nabil.

147.  The military seizure and detention of Petitioner Nabil by the Respondents is *ultra vires* and illegal because it violates Article II of the United States Constitution.  To the extent that the Executive asserts that Petitioner's detention is authorized by the Military Order, that Order exceeds the Executive's authority under Article II and is *ultra vires* and void on its face and as applied to Petitioner.

148.  To the extent that Respondents assert that their authority to detain Petitioner Nabil derives from a source other than the Military Order, including without limitation the Executive's inherent authority to conduct foreign affairs or to serve as Commander-in-Chief of the U.S. Armed Forces, whether from Article II of the Constitution or otherwise, Respondents lack that authority as a matter of fact and law.

149.   Accordingly, Petitioner Nabil is entitled to a writ of habeas corpus and to necessarily related declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### ELEVENTH CLAIM FOR RELIEF
### (VIOLATION OF THE APA AND THE MILITARY ORDER: ARBITRARY AND CAPRICIOUS UNLAWFUL DETENTION (INHUMANE TREATMENT))

150.   Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

151.   Army Regulation 190 - 8 prohibits the detention of civilians who were seized away from the field of battle or outside occupied territory or who were not engaged in combat against the United States. *See, e.g.,* Army Regulation. 190-8 at 1-6(g) ("Persons who have been determined by a competent tribunal not to be entitled to prisoner of war status may not be executed, imprisoned, or otherwise penalized without further proceedings to determine what acts they have committed and what penalty should be imposed.").

152.   By arbitrarily and capriciously detaining Petitioner Nabil in military custody for upwards of three years in the manner described above, Respondents have acted and continue to act *ultra vires* and unlawfully in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2).

153.   These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

154.   Accordingly, Petitioner Nabil is entitled to a writ of habeas corpus, and to necessarily related declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### TWELFTH CLAIM FOR RELIEF
### (VIOLATION OF THE APA AND THE MILITARY ORDER: ARBITRARY AND CAPRICIOUS DENIAL OF DUE PROCESS (INHUMANE TREATMENT))

155.   Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

156.   By the actions described above, Respondents, acting under color of law, have arbitrarily and capriciously denied and continue to deny Petitioner Nabil the process accorded to persons seized and detained by the United States military in times of armed conflict as established by Army Regulation 190-8 in violation of the Administrative Procedures Act, 5 U.S.C. §706(2).

157.   These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

158.   Accordingly, Petitioner Nabil is entitled to a writ of habeas corpus and to necessarily related declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### THIRTEENTH CLAIM FOR RELIEF
### (VIOLATION OF THE APA AND THE MILITARY ORDER: TORTURE AND CRUEL, INHUMANE OR DEGRADING TREATMENT)

159.   Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

160.   By the actions described above, the Respondents have acted and continue to act arbitrarily and capriciously by directing, ordering, confirming, ratifying, and/or conspiring to unlawfully subject Petitioner Nabil to torture and/or cruel, inhumane or degrading treatment in violation of Army Regulation 190-8 and the Administrative Procedures Act, 5 U.S.C. § 706(2).

161.   These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

162.   Accordingly, Petitioner Nabil is entitled to a writ of habeas corpus and to necessarily related declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### FOURTEENTH CLAIM FOR RELIEF
### (VIOLATION OF THE RIGHT TO COUNSEL AND ACCESS TO THE COURTS)

163.   Petitioner incorporates by reference all preceding paragraphs as if set forth fully herein.

164.   Respondents, purportedly acting from a concern for national security, consistently have contrived to intrude upon Petitioner Nabil's right to consult with counsel by conditioning counsel's access to Petitioner on

unreasonable terms, including classification/declassification procedures, all in violation of Petitioner Nabil's attorney-client privilege, his work product privilege, and the Fifth and Sixth Amendments to the U.S. Constitution.

165.  Accordingly, Petitioner Nabil is entitled to a writ of habeas corpus and to necessarily related declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### FIFTEENTH CLAIM FOR RELIEF
### (DUE PROCESS CLAUSE AND THE MILITARY ORDER: RENDITION OR THE THREAT THEREOF (INHUMANE TREATMENT))

166.  Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

167.  Upon information and belief, Petitioner Nabil is at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture and being threatened with same.  The transfer of the Petitioner (or threat of same) to a country where there is a foreseeable and direct risk that he will be subjected to torture constitutes a violation of Petitioner's rights under the Due Process Clause of the Fifth Amendment to the United States Constitution.

168.  These unlawful acts of Respondents violate the Military Order, as they constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

169.  Accordingly, Petitioner Nabil is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## SIXTEENTH CLAIM FOR RELIEF
### (CONVENTION AGAINST TORTURE AND CONVENTION RELATING TO THE STATUS OF REFUGEES AND THE MILITARY ORDER: RENDITION (INHUMANE TREATMENT))

170.    Petitioners incorporate by reference all preceding paragraphs as set forth fully herein.

171.    Upon information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture.  The transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a direct violation of Petitioner's rights under the Convention Against Torture and the 1954 Convention Relating to the Status of Refugees, 19 U.S.T. 6259, 189 U.N.T.S. 150 *entered into force* Apr. 22, 1954.

172.    Such rendition would violate the Military Order, as it would constitute illegal and inhumane treatment in violation of Section 3(b) of that order and would otherwise be illegal and *ultra vires*.

173.    Accordingly, Petitioner Nabil is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

## SEVENTEENTH CLAIM FOR RELIEF
### (ALIEN TORT STATUTE AND THE MILITARY ORDER: RENDITION (INHUMANE TREATMENT))

174.    Petitioners incorporate by reference all preceding paragraphs as if set forth fully herein.

175. Upon information and belief, Petitioner is at risk of being rendered, expelled or returned without lawful procedures to a country that engages in torture. The transfer of the Petitioner to a country that creates a foreseeable and direct risk that he will be subjected to torture constitutes a violation of Petitioner's rights under customary international law, which may be vindicated under the Alien Tort Statute.

176. Such unlawful acts of Respondents would violate the Military Order, as they would constitute illegal and inhumane treatment in violation of Section 3(b) of that order.

177. Accordingly, Petitioner Nabil is entitled to declaratory and injunctive relief, as well as any other relief the court may deem appropriate.

### SECTION V
### PRAYER FOR RELIEF

WHEREFORE, Petitioners pray for relief as follows:

1. Designate Jamaal Kiyemba as Next Friend of Nabil;

2. Grant the Writ of Habeas Corpus and order Respondents to release Petitioner Nabil from his current unlawful detention;

3. Order that Petitioner Nabil be brought before the Court or before a Magistrate Judge assigned by the Court to conduct proceedings under the supervision of the Court to vindicate his rights;

4.    Order that Petitioner Nabil cannot be transferred to any other country without the specific written agreement of Petitioner and Petitioner's counsel while this action is pending;

5.    Order that Petitioner Nabil cannot be delivered, returned, or rendered to a country where there is a foreseeable and imminent risk that Petitioner will be subject to torture;

6.    Order Respondents to allow counsel to meet and confer with Petitioner Nabil, in private and unmonitored attorney-client conversations;

7.    Order Respondents to cease all interrogations of Petitioner Nabil, direct or indirect, while this litigation is pending;

8.    Order Respondents to cease all acts of torture and cruel, inhumane and degrading treatment of Petitioner Nabil;

9.    Order and declare that the Military Order of November 13, 2001 is *ultra vires* and unlawful in violation of Article II of the United States Constitution, the Fifth Amendment to the U.S. Constitution, the Uniform Code of Military Justice, the Administrative Procedures Act, 5 U.S.C. §702, the treaties of the United States and customary international law;

10.    Order and declare that the prolonged, indefinite, and restrictive detention of Petitioner Nabil without due process is arbitrary and unlawful and a deprivation of liberty without due process in violation of common law principles of due process, the Due Process Clause of the Fifth Amendment to the United

States Constitution, the regulations of the United States military, the treaties of the United States, and customary international humanitarian law;

11.     Order and declare that continued obligating or expending of funds appropriated under HR 1268 to fund the construction, maintenance or operation of prisons, camps or other facilities at Guantánamo Bay is unlawful, and enjoin Respondents from further obligating or expending funds appropriated under HR 1268 for the construction, maintenance or operation of prisons, camps or other facilities at Guantánamo Bay; and

12.     Grant such other relief as the Court may deem necessary and appropriate to protect Petitioner's rights under the common law, the United States Constitution, federal statutory law, and international law.

Dated this **21st** day of **July**, 2005

Respectfully submitted,

Counsel for Petitioners:

*Todd W. Miller*
_____
Todd W. Miller (Colorado State Bar #16306)
Charles R. Lucy (Colorado State Bar #33456)
Rick D. Bailey (Colorado State Bar #26554)
J. Triplett Mackintosh (Colorado State Bar #22359)
Hamid M. Khan  (Colorado State Bar #34139)
James E. Williams (Colorado State Bar #34727)
Hillary M. Hebert (Colorado State Bar #35906)
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO  80202
Telephone:  (303) 295-8000

Of Counsel
Barbara J. Olshansky (New York State Bar #3635)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012
Telephone: (212) 614-6439

**CERTIFICATION OF REPRESENTATION WITHOUT COMPENSATION**

Counsel for Petitioners certify, pursuant to L. Cv. R. 83.2(g), that they are representing Petitioner without compensation. Counsel for Petitioners also certify, pursuant to L. Cv. R. 83.2(j), that they have personal familiarity with Local Rules of this Court.

Dated this 21ˢᵗ day of July, 2005.

Todd W. Miller (Colorado State Bar #16306)
J. Triplett Mackintosh (Colorado State Bar #22359)
Charles R. Lucy (Colorado State Bar #33456)
Rick D. Bailey (Colorado State Bar #26554)
Hamid M. Khan  (Colorado State Bar #34139)
James E. Williams (Colorado State Bar #34727)
Hillary M. Hebert (Colorado State Bar #35906)
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO  80202
Telephone:  (303) 295-8000

Of Counsel
Barbara J. Olshansky (New York State Bar #3635)
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway
New York, New York 10012
Telephone: (212) 614-6439

3392390_2.DOC

<u>AUTHORIZATION</u> & <u>NOTIFICATION</u>

I, JAMAL KIYEMBA ███████), UNDERSTAND THE LEGAL TERM "NEXT FRIEND" AND FIRMLY BELIEVE THAT THE FOLLOWING PEOPLE, (AS ATTACHED) WHO I HAVE COME TO KNOW DURING MY CAPTIVITY SINCE MARCH 2002, WANT ME TO ACT AS THEIR "NEXT FRIEND", AND AUTHORIZE CLIVE STAFFORD SMITH TO SEEK ANY LEGAL REDRESS ON THEIR BEHALF THAT IS POSSIBLE, AND I SO AUTHORIZE HIM. I ALSO SUBMIT THIS DOCUMENT AS EVIDENCE, INDEPENDENT OF THEIR RELIANCE UPON ME AS "NEXT FRIEND", OF THEIR SPECIFIC DESIRE FOR A LAWYER AND FOR A LEGAL CHALLENGE TO THE ILLEGALITY OF THEIR DETENTION BY THE UNITED STATES OF AMERICA.

THIS AUTHORIZATION & NOTIFICATION APPLIES TO ALL PERSONS LISTED ON THE ATTACHED LISTS, AS INITIALED BY ME.

MARCH 10ᵗʰ, 2005.

Kiyemba

NABIL

ALGERIAN

CAMP I french & Arabic