# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE:**<br>**GUANTANAMO BAY**<br>**DETAINEE LITIGATION** | **Misc. No. 08-442 (TFH)**<br>**Civil Action Nos.**<br>**02-CV-0828, 04-CV-1136, 04-CV-1164,**<br>**04-CV-1194, 04-CV-1254, 04-CV-1937,**<br>**04-CV-2022, 04-CV-2035, 04-CV-2046,**<br>**04-CV-2215, 05-CV-0023, 05-CV-0247,**<br>**05-CV-0270, 05-CV-0280, 05-CV-0329,**<br>**05-CV-0359, 05-CV-0392, 05-CV-0492,**<br>**05-CV-0520, 05-CV-0526, 05-CV-0569,**<br>**05-CV-0634, 05-CV-0748, 05-CV-0763,**<br>**05-CV-0764, 05-CV-0833, 05-CV-0877,**<br>**05-CV-0881, 05-CV-0883, 05-CV-0889,**<br>**05-CV-0892, 05-CV-0993, 05-CV-0994,**<br>**05-CV-0995, 05-CV-0998, 05-CV-0999,**<br>**05-CV-1048, 05-CV-1124, 05-CV-1189,**<br>**05-CV-1220, 05-CV-1236, 05-CV-1244,**<br>**05-CV-1347, 05-CV-1353, 05-CV-1429,**<br>**05-CV-1457, 05-CV-1458, 05-CV-1487,**<br>**05-CV-1490, 05-CV-1497, 05-CV-1504,**<br>**05-CV-1505, 05-CV-1506, 05-CV-1509,**<br>**05-CV-1555, 05-CV-1590, 05-CV-1592,**<br>**05-CV-1601, 05-CV-1602, 05-CV-1607,**<br>**05-CV-1623, 05-CV-1638, 05-CV-1639,**<br>**05-CV-1645, 05-CV-1646, 05-CV-1649,**<br>**05-CV-1678, 05-CV-1704, 05-CV-1725,**<br>**05-CV-1971, 05-CV-1983, 05-CV-2010,**<br>**05-CV-2083, 05-CV-2088, 05-CV-2104,**<br>**05-CV-2112, 05-CV-2185, 05-CV-2186,**<br>**05-CV-2199, 05-CV-2200, 05-CV-2249,**<br>**05-CV-2349, 05-CV-2367, 05-CV-2371,**<br>**05-CV-2378, 05-CV-2379, 05-CV-2380,**<br>**05-CV-2381, 05-CV-2384, 05-CV-2385,**<br>**05-CV-2386, 05-CV-2387, 05-CV-2398,**<br>**05-CV-2444, 05-CV-2477, 05-CV-2479,**<br>**06-CV-0618, 06-CV-1668, 06-CV-1674,**<br>**06-CV-1684, 06-CV-1688, 06-CV-1690,**<br>**06-CV-1691, 06-CV-1758, 06-CV-1759,**<br>**06-CV-1761, 06-CV-1765, 06-CV-1766,**<br>**06-CV-1767, 07-CV-1710, 07-CV-2337,**<br>**07-CV-2338, 08-CV-0987, 08-CV-1085,**<br>**08-CV-1101, 08-CV-1104, 08-CV-1153,**<br>**08-CV-1185, 08-CV-1207** |

## GOVERNMENT'S RESPONSE TO PETITIONER'S FILING
## ON FRAMEWORK PROCEDURAL ISSUES

### INTRODUCTION

Petitioners largely reject the carefully delineated proceedings of the controlling plurality in *Hamdi* v. *Rumsfeld*, 542 U.S. 507 (2004). Instead, petitioners envision an expansive quasi-criminal proceeding to challenge their detention with wide-ranging discovery and a panoply of procedural rights nowhere contemplated by the Supreme Court. Indeed, the Supreme Court, both in *Hamdi*, and *Boumediene v. Bush*, 128 S. Ct. 2229 (2008), called for a much more modest role for the courts in evaluating wartime detention decisions than that proposed by the petitioners. Many of petitioners' proposals ignore or directly contradict the framework for these cases set forward in *Hamdi*, and their proposal for factfinding is anything but "prudent and incremental." *Hamdi*, 542 U.S. at 539. Instead, petitioners' proposals closely resemble the expansive criminal-type procedures that the *Hamdi* district court had ordered but that the Supreme Court reversed as overbroad. The procedures they propose trivialize both the unique circumstance these habeas cases present – where judges will be evaluating the intelligence and information that leads to military actions taken overseas during an active military conflict – and the weighty national security interests that the Supreme Court has repeatedly recognized must be part of the balance.

This context demands a more modest role for this Court—one where, to be sure, each petitioner and the Court is provided notice of the Government's basis for detention through the filing of a factual return, but one where: (i) the Court must giver proper weight to the Government's military determination to detain an individual as an enemy combatant by, among other things, presuming the correctness of the information relied upon by the Government in making that military decision, even though it will often be hearsay evidence; (ii) the petitioner is

entitled to rebut that showing with his *own* factual submission, but not to seek discovery from the Government or otherwise; and (iii) the Court must then dismiss the petition unless petitioner's showing is more persuasive than the Government's. Only if a petitioner makes such a more persuasive showing should this Court consider further evidentiary and factfinding proceedings.

Petitioners rely heavily on the habeas statute, but nowhere address the fact that *Hamdi* required implementation of much narrower procedures when that same habeas statute clearly was applicable. Now it is not. Petitioners fail to come to terms with the fact that Congress *repealed* that statute and, accordingly, "now there must be constitutionally based jurisdiction or none at all." *Boumediene*, 128 S. Ct. at 2278 (Souter, J., concurring). As we have demonstrated, the *constitutional* requirements for habeas are the applicable rules going forward. In any event, petitioners interpret the statute far more expansively than is warranted and indeed envision a process exceeding even the process afforded in the habeas statute and rules. The habeas statute provides for very limited discovery, at most, and summary resolution of the facts—not a norm of free-wheeling discovery and trial-type hearings. The habeas statute certainly does not mandate what petitioners demand, but at most allows courts some flexibility in the procedures employed. It would be improper to use this flexibility as a means of requiring criminal trial-like procedures in light of both *Hamdi* and Congress's judgment (reflected in the DTA and the MCA) that there should be no habeas procedures available at all in this context. Prudent implementation of the habeas statute in this context should be informed by Congress's clear intent for these cases, and thus used to require only the constitutional minimum, and nothing more. Nor is such prudent implementation foreclosed by *Boumediene*, which stressed that "[t]he extent of the showing required of the Government in these cases remains to be determined." 128 S. Ct. at 2271.

Petitioners effectively demand that the Government meet an evidentiary standard that is

inconsistent not only with *Hamdi*, but also the reality that a much less onerous showing is sufficient to justify even the lethal use of military force abroad.  Moreover, the criminal-like procedures that petitioners propose would, as a matter of course, require military and intelligence officers to appear in person in testimonial hearings.

Aside from being a fatally flawed as a legal matter, petitioners' proposed framework will do nothing to provide a workable construct for this Court to proceed on over 200 habeas petitions.  Petitioners give short shrift to the fact that the situations involved in these habeas cases are all quite similar – each involves an enemy alien who has been captured outside the United States as part of military operations in a war with al Qaeda, the Taliban, and associated forces; each has been determined by the Executive to be an enemy combatant in that war; and each is detained abroad.  These circumstances warrant even greater deference than *Hamdi*, which involved a citizen detained within the United States and entitled (unlike petitioner here) to all of the rights afforded by the United States Constitution and by the modern habeas statute and rules.  Thus, *Hamdi* provides the outer bounds for the process appropriate here.

The Court also should reject petitioners' proposal to leave many of these issues to the discretion of each individual judge in each individual case.  The lack of uniform baseline procedures necessarily means that decisions on foundational issues such as factfinding and confrontation will lead to variant results that will force both sides to seek further review.  Indeed, fifteen different approaches to the procedural framework for handling these cases would likely lead to fourteen different sets of reversals.  Petitioners' proposal will therefore *not* lead to either the expeditious or just resolution of these habeas actions; it will lead only to further delay.  Procedurally, the way forward is clear, it was set out in *Hamdi* and that path calls for a burden-shifting approach and a prudent and incremental response in each of the areas identified by the Court for common resolution.  The Government's proposed framework does just that and gives

petitioners their day in Court, without delay.

**I.      PETITIONERS' PROPOSAL REJECTS THE *HAMDI* FRAMEWORK AND CALLS FOR THE QUASI-CRIMINAL PROCESS THAT THE SUPREME COURT REJECTED.**

We have explained why this Court should enter an order implementing the *Hamdi* framework. Govt. Br. at 4-14. That framework gives the Court what it must have under *Boumediene*: "the means to correct errors," including "some authority to assess the sufficiency of the Government's evidence against the detainee"; "the authority to admit and consider relevant exculpatory evidence" that each petitioner may wish to introduce; and "the means [for petitioners] to supplement the record on review." 128 S. Ct. at 2270. At the same time as it was outlining these habeas essentials, *Boumediene* expressly *rejected* criminal-type proceedings, explaining that "[h]abeas corpus proceedings need not resemble a criminal trial, even when the detention is by executive order." *Id*. at 2269. The *Hamdi* Court likewise expressly rejected the imposition of a "process [that] would approach the process that accompanies a criminal trial" including "quite extensive discovery of various military affairs." *Hamdi*, 542 U.S. at 528.

Despite these plain holdings, petitioners would discard the *Hamdi* framework in favor of highly intrusive, quasi-criminal process to challenge their detention. Such a course would be unprecedented and unworkable. Petitioners propose that they are entitled to trial-type hearings to resolve *any* disputed issues of material fact, *see* Pets' Br. at 7-9, as if this were a criminal trial or a run-of-the-mill civil case. But this is *not* such a proceeding – instead, it is much different and the Court must "presum[e]" the Government's "credible evidence" to be correct unless the petitioner puts forward his own "more persuasive evidence." *Hamdi*, 542 U.S. at 534. This "prudent and incremental" approach is not governed by the Federal Rules of Civil or Criminal Procedure or the Federal Rules of Evidence, but is properly governed by the controlling Supreme Court opinion in *Hamdi*. *Id*. Moreover, petitioners envision a fulsome discovery process "more

- 4 -

permissive" than that provided in modern statutory habeas cases, Pets' Br. at 21, and even

broader than the discovery that accompanies criminal proceedings. *See id.* at 24 (seeking entry of

an order requiring a search of "all . . . evidence . . . in [the Government's] possession" for

exculpatory material); *id*. at 20 (observing that some litigants may seek "all 'Government

Information'" relating to a petitioner); *id*. at 33 (seeking to "take * * * depositions"). Petitioners

seek imposition of a duty on the Government even broader than that in criminal cases: to

provide any and all exculpatory evidence – regardless of its materiality or who knows about it –

and to, remarkably, place upon the United States military and intelligence community, an

affirmative "duty to learn of any favorable evidence known to the others acting on the

government's behalf." *Id.* at 22. *Hamdi* expressly rejected this sort of broad, criminal discovery.

542 U.S. at 528. Petitioners also argue that while some hearsay may be permitted, the Court

should employ a searching standard in evaluating whether it is permissible. Pets' Br. at 31.

Again, this is contrary to *Hamdi*, which directed the lower courts to consider hearsay material as

the best available evidence, and it gives no regard to the practical limitations imposed by the

"rubble of war." 542 U.S. at 532-34. Finally, petitioners appear to suggest that live witness

testimony through compulsory judicial process will be the norm and that the right to cross

examine Government witnesses – including intelligence and military personnel – be afforded as

a matter of course. *See* Pets' Br. at 33-35. In sum, petitioners propose that this Court adopt a

quasi-criminal scheme far greater than even the procedures afforded in the statutory habeas

provisions that Congress repealed as to these petitioners. The Court should not accept this

invitation for at least three reasons.

 First, as just pointed out, an expansive quasi-criminal procedural framework was

expressly rejected by the *Hamdi* Court. The district court in that case had refused to rely on

hearsay and "ordered the Government to turn over numerous materials for in camera review,

including copies of all of Hamdi's statements and the notes taken from interviews with him that related to his reasons for going to Afghanistan and his activities therein; a list of all interrogators who had questioned Hamdi and their names and addresses; statements by members of the Northern Alliance regarding Hamdi's surrender and capture; a list of the dates and locations of his capture and subsequent detentions; and the names and titles of the United States Government officials who made the determinations that Hamdi was an enemy combatant and that he should be moved to a naval brig." *See Hamdi*, 542 U.S. at 513-14.  This actual order in *Hamdi* is narrower than the limitless discovery sought by petitioners here.  But the Supreme Court reversed this order and others, describing the process contemplated by the district court as something that "would approach the process that accompanies a criminal trial" and as "anticipat[ing] quite extensive discovery of various military affairs." *See Hamdi*, 542 U.S. at 528.  Thus, the Supreme Court clearly and squarely rejected this approach even for *citizen* detainees, holding that "the process apparently envisioned by the District Court below" does not "strike[] the proper constitutional balance when a United States citizen is detained in the United States as an enemy combatant." *Id.* at 532.  Petitioners' proposals for evidentiary hearings, sweeping discovery into military and intelligence matters, and the like, demand an even a more burdensome process than that rejected in *Hamdi* as overbroad even for an American citizen detainee.

Second, petitioners' framework seeks to remove from these proceedings any degree of deference to the Executive Branch in carrying out wartime operations.  While agreeing that these petitioners are entitled to invoke constitutional habeas corpus, the Supreme Court also recognized that in "considering . . . the procedural . . . standards used to impose detention to prevent acts of terrorism, proper deference *must be accorded to the political branches*." *Boumediene*, 128 S. Ct. at 2276 (emphasis added).  Petitioners' proposed framework, however,

accords no deference to the political branches.  Indeed, petitioners' proposed procedural framework suggests that "the government bear the burden of demonstrating the lawfulness of the detention by clear and convincing evidence," *see id.* at 10, and its decision to detain and evidence is entitled to *no* presumption of validity.  *Id.* at 14-18.  This proposal is contrary not only to *Boumediene*'s holding that deference is required, but also to *Hamdi*, which called for an evidentiary showing not by clear and convincing evidence, but by "credible evidence," and which expressly endorsed a presumption in favor of the Government's evidence in these circumstances.  *Hamdi*, 542 U.S. at 534.

Third, petitioners' course is wholly unprecedented and will prove unworkable given the large number of habeas petitions at hand.  Indeed, petitioners envision limited coordination and expect individual judges to decide issues of discovery in an ad hoc manner that will necessarily lead to inconsistent rulings on basic procedural points that all parties should have a strong interest in resolving consistently.  Such a course can only further delay these cases rather than resolve them.  The "prudent and incremental" approach is to require an orderly, manageable process whereby the Government first submits a factual return containing credible evidence that is presumed valid; the petitioner submits a traverse that must contain more persuasive evidence; and that any additional process, taken in incremental steps, is appropriate only if the weight of the evidence supports the petitioner.   To be sure, petitioners will, as the Supreme Court emphasized in *Boumediene*, be able to participate in an adversarial process, have notice of the basis of their detention, and challenge that detention through supplementation of the record with *their* information.  But the Court may properly limit its review as established by *Hamdi*.  The Court should thus enter a case management order implementing the *Hamdi* framework, as proposed by the Government.

## II.    PETITIONERS' SPECIFIC PROPOSALS ARE INCONSISTENT WITH THE

*HAMDI* **FRAMEWORK.**

**A.**    **The *Hamdi* Burden-Shifting Approach Is Appropriate In These Cases and Should Be Implemented.**

As we explained in our opening brief, this Court should enter an order that implements the *Hamdi* burden-shifting approach in assessing the facts that support the Executive Branch's decision to detain a petitioner as an enemy combatant.  Govt. Br. at 14-15.  Under that approach, the Government would first "put[] forth credible evidence that the habeas petitioner meets the enemy-combatant criteria."  *Hamdi*, 542 U.S. at 534.  The petitioner must then rebut that evidence "with more persuasive evidence."  *Id.*  Only if that more persuasive showing is made will the Court then engage in additional factfinding.

**1.**    **The Clear and Convincing Evidence Standard Proposed by Petitioners Is Incorrect and Inconsistent with the *Hamdi* Burden-Shifting Approach.**

Petitioners argue that military detention is appropriate only if the Government has "clear and convincing" evidence that the detainee is an enemy combatant.  Application of that standard is wrong on multiple levels.  First, it is inconsistent with the standard set out by the controlling plurality in *Hamdi*, and, remarkably, petitioner nowhere cites that opinion in its discussion of the Government's burden.  Second, it is grossly at odds with a habeas court's traditional role in reviewing the factual basis for Executive detention decisions.  Indeed, petitioners urge that this Court apply substantive standards used in other detention contexts, but ignore *this* context, namely, how much evidence justifies a soldier's military decision to apprehend an apparent enemy in the field rather than allow him to potentially return to battle.  The answer to that question is far different from the question presented in any of the domestic proceedings cited by the petitioners, such as civil commitment or pre-trial detention, where the stakes and setting are far different.

The Supreme Court in *Hamdi* set forth the standard that the Government must meet to

satisfy a habeas Court's inquiry into the factual basis for detention – if the Government "put[s] forth *credible evidence* that the habeas petitioner meets the enemy-combatant criteria," it has met its factual burden.  *Hamdi*, 542 U.S. at 534 (emphasis added).  This standard is a far cry from the "clear and convincing evidence" standard proposed by petitioners.  Because petitioner's proposed evidentiary standard is flatly inconsistent with *Hamdi*, it must be rejected.

Petitioners argue that a clear and convincing standard is appropriate because in cases of executive detention – without prior criminal judgment by a court – the "'protections [of the writ] have been the strongest.'" Pets' Br. at 10 (quoting *St. Cyr*, 533 U.S. at 301).  But petitioners ignore the context of that statement in *St. Cyr* – it was made to show that in cases of executive detention, a habeas court would review "pure questions of law," *St. Cyr*, 533 U.S. at 305; indeed, *St. Cyr* quite plainly stated that, even in the context of executive detention, habeas "courts generally did not review factual determinations made by the Executive" other than to determine whether the decision was supported  by "some evidence."  *Id*. at 306.  Thus, the protections of the writ in the context of executive detention lend no support to petitioners' claim that this Court should review the determination under a clear and convincing evidence standard.

Petitioners next argue that a "clear and convincing" evidentiary standard is appropriate because this is the standard employed in domestic civil commitment cases.  Pets' Br. at 11-12. Petitioners are only partially correct in their assessment of domestic law;[1] but more importantly

---

[1]The immigration cases cited by petitioners imposed a clear and convincing standard not based on any constitutional requirement, but because "Congress has not addressed itself to the question of what degree of proof is required." *Woodby v. INS*, 385 U.S. 276, 284 (1966); *Schneiderman v. United States*, 320 U.S. 118, 132 (1943) ("naturalization is a privilege, to be given or withheld on such conditions as Congress sees fit").  *Schneiderman* also dealt with the unique circumstance of revoking citizenship, a circumstance that does not provide a ready analogy for the wartime detention at issue here, as it involved an attempt to reverse a prior judicial decree where "rights once conferred should not be lightly revoked," and it implemented a preference (entirely inapposite here) that "the facts and the law should be construed as far as is reasonably possible in favor of the citizen."  *Id.* at 122, 125.

it is entirely inappropriate to incorporate that law in this context.   Cases involving pre-trial

detention or civil commitment strike at the heart of liberty in this nation in peacetime, where

"liberty is the norm, and detention . . . without trial is the carefully limited exception."  *United*

*States v. Salerno*, 481 U.S. 739, 755 (1987).  In those cases, "the Court deemed it inappropriate

to ask the individual 'to share equally with society the risk of error.'"  *Jones v. United States*,

463 U.S. 354, 367 (quoting *Addington v. Texas*, 442 U.S. 418, 427 (1979)).  This is an entirely

different context.  It involves fundamental questions pertaining to the security of the nation itself,

questions heightened by technological advances that give terrorist organizations the ability to

inflict devastation on a massive scale, a power heretofore limited only to nation-state actors and

vividly illustrated by the attacks of September 11th, 2001.  Here the risk of error tips decisively

in favor of society's interests in self-preservation.  And indeed, the Executive's actions in

response to these threats have been taken with the full authority of Congress, not to prevent

criminality or deviant dangerous behavior that threatens individuals, but for the preservation of

the nation and its citizenry writ large in a time of war.  Unsurprisingly, petitioners' own cases

specifically distinguish detention that arises as part of "the exigencies of war."  *Salerno*, 481

U.S. at 748.

        The concerns that led to the "clear and convincing" standard in the domestic law-

enforcement and civil confinement contexts have no applicability in the context of wartime

detention of the enemy.  There is no "norm" against detention without trial in these

circumstances – instead, trials are *not* the norm when taking military action abroad that includes

the detention of the enemy.  Third Geneva Convention, Art. V; Army Reg. 190-8.  Moreover, it

would be misguided at best to impose on our service members – who place themselves in harm's

way on a daily basis in defense of our country – the obligation to "share equally" in the risk of

error, much less share *the bulk* of the burden of error if enemy combatancy has not been

established by clear and convincing evidence. Indeed, if anything, when fighting a war overseas,

as the United States is doing today, against belligerents who show no respect for the traditional

laws of war, the risk of error must be weighed heavily *the other way* to protect our soldiers, our

citizens, and our homeland. *Cf. Salerno*, 481 U.S. at 750-51 ("as our cases hold, this right [not

to be detained] may, in circumstances where the government's interest is sufficiently weighty, be

subordinated to the greater needs of society"); *Addington*, 441 U.S. at 430 ("[n]or should the

state be required to employ a standard of proof that may completely undercut its efforts to further

the legitimate interests of . . . the state . . . that are served by civil commitments").

In sum, as *Hamdi* explained, the Court must "giv[e] due regard to the Executive once it

has put forth meaningful support for its conclusion that the detainee is in fact an enemy

combatant." *Hamdi*, 542 U.S. at 534. For wartime detention decisions, the primary risk of error

must fall in a way so as to protect the United States, its citizens, and its service members, rather

than the opposite as petitioners suggest.[2]

### 2.    The Government's Evidence is Entitled to a Presumption of Validity.

Petitioners urge that no presumption in favor of the Government's evidence is

appropriate. But this contention is directly contrary to *Hamdi*, which expressly endorsed just

such a presumption for a wartime detention in a context that is different only in that, there, *more*

constitutional protections applied. Even in that context where the detainee was a citizen, and

---

[2]In the wartime detention context, the consequences of even a single erroneous release
can be catastrophic. *See* Mintz, John, *Released Detainees Rejoining The Fight*, Washington Post
(Oct. 22, 2004) ("One of the repatriated prisoners is still at large after taking leadership of a
militant faction in Pakistan"; he had "maintained the fiction that he was an innocent Afghan
tribesman" while at Guantanamo); Rubin, Alissa, *Former Guantanamo Detainee Tied to Attack*,
New York Times (May 8, 2008) (reporting that "[a] former Kuwaiti detainee at the United States
prison camp at Guantanamo Bay, Cuba, was one of the bombers in a string of deadly suicide
attacks in the northern Iraqi city of Mosul last month"),

thus, afforded the full panoply of constitutional protections, the Court stated that "the Constitution would not be offended by a presumption in favor of the Government's evidence, so long as that presumption remained a rebuttable one and fair opportunity for rebuttal were provided." *Hamdi*, 542 U.S. at 534. That ability to rebut, the controlling plurality explained, "would sufficiently address the 'risk of erroneous deprivation' of a detainee's liberty interest" and therefore satisfy the requirements of the Due Process Clause in protecting the liberty interest of a United States citizen. *Id.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). *A fortiori* such a presumption is appropriate here, where the detainees are not citizens, constitutional protections are therefore lesser, and the habeas statute is inoperative except as constitutionally compelled.

Petitioners do not really challenge this aspect of *Hamdi*, but instead claim that a presumption is improper because, in their view, a CSRT determination "is entitled to no deference" because it was an "administrative, non-adversarial process." Pets' Br. at 15. Petitioners also cite various historical cases where courts "declined to defer" to a detention decision, but instead conducted de novo review. *Id.* at 17 (citing *Ex Parte Bollman*, 8 U.S. 75, 125 (1807)). But the issue of deference to a CSRT administrative determination (or the magistrate's determination in *Bollman*) has no relevance to whether the Government's factual evidence is entitled to the presumption endorsed by *Hamdi*. There were no CSRTs at the time *Hamdi* was decided, and *Hamdi* endorsed a presumption in favor of a declaration filed by " a knowledgeable affiant to summarize" the "documentation regarding battlefield detainees already . . . kept in the ordinary course of military affairs." *Id.* at 534-35. That is precisely the sort of evidence that will comprise the factual returns in these cases, and the same presumption in favor of that evidence is therefore warranted. In any event, the Court in *Hamdi* also reasoned that deference is appropriate in these circumstances, as a Court must "giv[e] due regard to the

- 12 -

Executive once it has put forth meaningful support for its conclusion that the detainee is in fact an enemy combatant." *Id.* at 534.[3]

Petitioners next argue that a presumption is not warranted because the Court in *Boumediene* directed that there be "plenary habeas review into the 'sufficiency of the Government's evidence.'" Pets' Br. at 16. But sufficiency review is deferential even in less sensitive contexts than here, *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and the fact that this Court will be conducting a review of the sufficiency of the Government's evidence to warrant detention is in no way inconsistent with according that evidence a presumption of validity. In those circumstances, if the Government's evidence is not more persuasively rebutted, the Court will simply perform the familiar task of determining if that evidence, presumed true, is sufficient to support the conclusion that the detainee is an enemy combatant. *Cf. id.* (in reviewing sufficiency of evidence supporting criminal conviction, court "view[s] the evidence in the light most favorable to the prosecution"); *United States v. Pettiford*, 517 F.3d 584 (D.C. Cir. 2008) (applying sufficiency of evidence review in criminal case).

Petitioners also contend that *Boumediene* directly rejected a presumption in favor of the Government's evidence. Pets' Br. at 16-17 (citing *Boumediene*, 128 S. Ct. at 2260, for the proposition that "a central defect" of the CSRT is that the "'Government's evidence is accorded

---

[3]While it is outside the scope of this procedural briefing, it is well established that, on the merits, the military's detention decision must be afforded substantial deference. *See id.*; *Hirota v. MacArthur*, 338 U.S. 197, 215 (1949) ("the capture and control of those who were responsible for the Pearl Harbor incident was a political question on which the President as Commander in Chief, and as spokesman for the nation in foreign affairs, had the final say"); *Aguayo v. Harvey*, 476 F.3d 971, 978-79 (D.C. Cir. 2007) (noting "the limited scope of review in military habeas cases" where "considerable deference" is appropriate); *Doe v. Sullivan*, 938 F. 2d 1370, 1380 (D.C. Cir. 1991) ("The Supreme Court has cast the principle of judicial deference to the electoral branches in military matters in broad terms."); *Thomasson v. Perry*, 80 F.3d 915, 924-26 (4th Cir. 1996). *Bollman*, a case involving a routine pre-trial detention judgment in a domestic criminal case, is of no relevance to the military's determination to detain a captured combatant in wartime on the question of deference.

a presumption of validity'"). This contention is plainly wrong. The Court nowhere addressed the *Hamdi* Court's holding that a presumption by the habeas court is appropriate. Instead, the Court was expressing concern over an administrative presumption that was all-but irrebuttable. *Boumediene*, 128 S. Ct. at 2260. There, the detainee's "ability to rebut the Government's evidence against him" was limited by the absence of counsel in CSRT proceedings, the rigorously enforced limits on what "reasonably available" evidence a detainee could request, *see* CSRT procedures, Enc. 1, § (G)(2), and the fact that he could submit no exculpatory evidence in subsequent court proceedings under the DTA. *Boumediene*, 128 S. Ct. at 2260. Here, on the other hand, the presumption is fully rebuttable by the petitioner who, with counsel, will have an adequate opportunity to present all of his own evidence. In such circumstances, the *Hamdi* "presumption in favor of the Government's evidence" is entirely appropriate. 542 U.S. at 534.

The presumption is also appropriate given the nature of much of the evidence to be presented. In many cases, evidence will be derived from intelligence that experts in the intelligence agencies and the military deem reliable for purposes of conducting military operations – which may involve the use of lethal force. It is, thus, entirely appropriate to defer to their expertise with such information and their assessment. Indeed, judges have "little or no background in the delicate business of intelligence gathering" and "[t]here is no reason . . . to have great confidence in the ability of judges to make" intelligence-related judgments correctly. *CIA v. Sims*, 471 U.S. 159, 176 (1985).

Petitioner also argues that the *Hamdi* presumption should not be implemented as a "categorical rule" because such a categorical presumption was not endorsed in the opinion by Judge Traxler in *Al-Marri* v. *Pucciarelli*, — F.3d —, 2008 WL 2736787, *42 (4th Cir. July 15, 2008) (Traxler, J., concurring). This claim is erroneous for two reasons. First, while Judge Traxler, writing only for himself, acknowledged the fact that "the Supreme Court intended its

[*Hamdi*] framework to apply to every habeas petition filed by an alleged enemy combatant," *id.* at *45, he then erroneously failed to implement it.  As Judge Wilkinson explained in response, Judge Traxler  erroneously required that the Government establish that it was submitting the "most reliable available evidence."  *Id.* at *70, *110 (Wilkinson, J., concurring in part and dissenting in part).  Such a standard is a "fundamental misapplication of *Hamdi*," *id.* at 111, because it amounts to "abandon[ment of] the careful incrementalism and the actual 'burden-shifting scheme' set forth by the Supreme Court."  *Id.  Hamdi* required, as we have explained, that the Government put forth "credible evidence"; it did not require the Government to establish that its evidence is the most reliable available.  *Hamdi*, 542 U.S. at 534.  Indeed, without such a presumption in favor of non-rebutted evidence, "the whole *Hamdi* burden-shifting framework would be rendered useless."  *Al Marri*, 2008 WL 2736787, at *109 (Wilkinson, J., concurring in part and dissenting in part).[4]

## B.    There is No Entitlement to Discovery in these Proceedings.

Discovery into military affairs by those who have been determined to be our enemies poses unique risks to our nation's security.  As this Court recognized in a related context, the "discovery process alone risks aiding our enemies by affording them a mechanism to obtain what information they could about military affairs and disrupt command missions by wresting officials from the battlefield to answer compelled deposition and other discovery inquiries."  *In re Iraq and Afghanistan Detainees Litigation*, 479 F. Supp. 2d 85, 105 (D.D.C. 2007).

## 1.    A Framework Order Precluding Discovery Should Be Entered.

As we argued in our opening brief, petitioners are not entitled to any discovery in these

---

[4]In any event, Judge Traxler's opinion by its terms governs only cases in which (as in *Al Marri*, but unlike *Hamdi* or here) a detainee was arrested within the United States.  *Al Marri*, 2008 WL 2736787, at *42, 45-46.

proceedings and it should be precluded by court order. Going back to the founding, there is no history of discovery in habeas cases (or in civil cases generally, where it was an innovation with the Federal Rules of Civil Procedure) that could possibly give rise to a right to discovery in constitutionally-based habeas proceedings. Govt. Br. at 15-19. The Court in *Boumediene* did not identify discovery as one of the essential elements of constitutional habeas. Congress's repeal of statutory habeas jurisdiction, in conjunction with the fact that constitutionally-derived habeas corpus does not require discovery, is therefore fatal to the claim that discovery, much less discovery more extensive than that in statutory habeas, is appropriate in these proceedings.

The rules adopted by the Supreme Court to govern statutory habeas proceedings set a *ceiling*, not a floor, for proceeding under *constitutional* habeas. And even if the habeas statute did apply, the Court's application of it should be guided by Congress's unmistakable intent to limit these habeas proceedings, as expressed in the DTA and MCA. Accordingly, while petitioners may provide their *own* evidence and version of events for this Court's consideration, any discovery they may be granted from the Government is a matter of Executive discretion rather than a constitutional entitlement.

Petitioners argue for *no framework limits* on discovery, before or after the submission of petitioners' traverse, a result that cannot stand in light of the fact that no discovery at all is authorized in these proceedings. Such a proposal is also flatly incompatible with *Hamdi*'s application of the habeas statute. In support of imposing no limits on discovery, petitioners cite the *Hamdi* decision's description of the discovery authorized by 28 U.S.C. § 2246. Pets' Br. at 19 (speaking to "'the taking of evidence in habeas proceedings by deposition, affidavit or interrogatories'") (quoting *Hamdi*, 542 U.S. at 525). But this citation lends no support to petitioners' request for unrestricted discovery. As we have explained, although *statutory* habeas was available in *Hamdi*, only *constitutional* habeas is available here. In any event, even the

- 16 -

habeas statute does not *require* a court to permit discovery. Indeed, discovery is unquestionably the exception, not the norm, in statutory habeas cases in peacetime – and is all the less appropriate here given both the wartime context and Congress's clear intent to limit procedures to the constitutional minimum. Moreover, the *Hamdi* Court quoted the habeas statute on its way to *reversing* the district court's discovery order and *limiting* when additional factfinding would be appropriate, *i.e.*, only after a court concludes that a petitioner has successfully rebutted the Government's showing. And even then, as *Hamdi* directed, any such factfinding must be "prudent and incremental" and cannot be as broad as that available in criminal proceedings.[5]

Petitioners also cite statutory habeas cases to argue that no framework order is appropriate addressing discovery because the issue whether discovery is appropriate depends on "'the facts of [a] particular case.'" Pets' Br. at 20 (quoting *Bracy v. Gramley*, 520 U.S. 899, 909 (1997)). But *Hamdi* itself addressed the facts of a case involving the detention of enemy combatants apprehended overseas in wartime. The *Hamdi* Court weighed the competing considerations to come up with its burden-shifting framework. Under *Hamdi*, as we have explained, no discovery or other factfinding procedures are appropriate even under the habeas statute and modern habeas practice, prior to a Court employing the burden-shifting framework. Thus, the balance on discovery has already been struck even for statutory habeas cases of this type, and petitioners should not be allowed to evade the *Hamdi* framework by simply citing the general principle that the propriety of discovery depends on the facts and circumstances

---

[5]Petitioners also take out of context a quote in *Boumediene* to incorrectly state that the Court held that discovery was an essential aspect of substitute habeas proceedings. Pets' Br. at 19. The *Boumediene* Court stated that one critical shortcoming in DTA proceedings was the fact that the "detainee . . . would have no opportunity to present evidence discovered after the CSRT proceedings concluded." *Boumediene*, 128 S. Ct. at 2272. Contrary to petitioners' suggestion, the Court was using the term "discovered" here in its common sense meaning, not to connote judicially-sanctioned discovery of information from an opposing party in litigation.

presented.[6]

Contrary to petitioners' claim, the "unique challenges . . . in gathering evidence" do not support authorizing discovery, Pets' Br. at 21, those challenges arise from the wartime context and call emphatically for *limiting* or *precluding* discovery, as *Hamdi* itself reasoned. 542 U.S. at 533. As *Hamdi* explained, "the exigencies of the circumstances may demand that, aside from these core elements, enemy-combatant proceedings may be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict." *Id*. The first "tailoring" performed by the Court was reversing the district court's broad discovery order and imposing the *Hamdi* burden-shifting framework. The Court thus has already rejected petitioners' suggestion that "preliminary discovery" may be needed to "identify the evidence that is helpful to their case." Pets' Br. at 21.

As we explained in our opening brief, even if discovery were constitutionally required, it should occur only very rarely, and only after considering the factual return and traverse. Further, each specific discovery request must be approved by the district court, as is contemplated by rules for statutory habeas.[7] The discovery authorized must be incremental under *Hamdi* and *Boumediene*. *See Hamdi*, 542 U.S. at 539 (factfinding must be "both prudent and incremental"); *Boumediene*, 128 S. Ct. at 2262 ("habeas procedures" should be "modified to address" "practical barriers"). Discovery that is not both extraordinarily rare and narrow is also antithetical to the expedited disposition of the over 200 cases at issue.

---

[6]Petitioners' request to have discovery that is"*more permissive*" than in statutory habeas cases (Pets' Br. at 21) should be rejected out of hand, given *Hamdi*. Pets' Br. at 21. So should petitioners' claim that the scope of discovery should be guided by the "full opportunity for discovery pursuant to state or federal rules of criminal procedure," Pets' Br. at 20, the precise type of discovery explicitly rejected in *Hamdi*. 542 U.S. at 528.

[7]Petitioners agree that discovery in habeas cases "requires leave of court." Pets' Br. at 19.

To this end, even if it were ever permissible, a discovery request would have to be quite specific:  It must "provide reasons for the request" and "include any proposed interrogatories and requests for admission, and must specify any requested documents."  Habeas Rule 6(b).  Even under modern habeas practice, it is a petitioner's burden to show in making such a request that based on "specific allegations" that "if the facts are fully developed" he may be "entitled to relief."  *Bracy*, 520 U.S. at 908-09 (quotation marks omitted).  The request must be appropriately "incremental": first, an expansion of the record pursuant to habeas Rule 7; limited interrogatories or requests for admission that may be answered by any appropriate Government personnel; document requests must be considered only after requests for admission, and must be narrow and focused on specific documents, not open-ended.  Such concerns, and the exigencies of considering over 200 cases on an expedited basis, strongly militate against open-ended discovery even if it is in some rare cases constitutionally required.

> **2.     The Government Will Voluntarily Submit Evidence Discovered by its Attorneys in Preparing the Factual Return that Materially Undermines the Information Presented in the Return to Support the Petitioner's Classification, But Cannot Properly Be Ordered to Provide Exculpatory Information.**

In our opening brief, we explained that, although not constitutionally required, the Government would submit any evidence that tends materially to undermine information presented in the return to support a petitioner's classification as an enemy combatant, which is encountered in developing the returns by the attorneys preparing them (including the Department of Justice attorneys assigned to the case and those Department of Defense attorneys working on the case with them).  This voluntary disclosure would make further discovery unnecessary and inappropriate, even if some discovery were constitutionally required.  The Government plans to provide this information even though the *Hamdi* plurality expressly *rejected* the imposition of a "process [that] would approach the process that accompanies a criminal trial" including criminal

- 19 -

discovery that is delineated by a prosecutor's *Brady* obligation.  *See Hamdi*, 542 U.S. at 528; *see id*. at 532-33.

Petitioners seek a court order requiring the Government to provide "all exculpatory evidence . . . in its possession."  Pets' Br. at 24.  This order cannot properly be imposed and, in any event, is overbroad and unduly burdensome.  It is difficult to overstate the burden such a requirement would impose—effectively forcing intelligence agencies to redirect massive amounts of resources from protecting our national security to a limitless fishing expedition, in which they would be obligated to search countless databases for any shred of information that might arguably be considered "exculpatory."  *See Bismullah v. Gates*, No. 06-1198, Petition for Rehearing En Banc, at 8-10 (D.C. Cir., filed Sept. 7, 2007) (submitting declarations from the military and intelligence community explaining that a search for material on a detainee results in "tens of thousands, and in many cases hundreds of thousands, of documents . . . little of which has anything to do with the detainee or his enemy combatant status").

Further, such an order cannot properly be imposed for the reasons we explained in our opening brief.  First, there is *no Brady* obligation in civil proceedings, including statutory habeas proceedings, and it would be extraordinary to impose one outside of the criminal context for the first time ever in a case involving wartime detention where any disclosures could potentially threaten national security.  *See In re Iraq and Afghanistan Detainees Lit.*, 479 F. Supp. 2d at 105.  Second, the Government's voluntary undertaking, while narrower than *Brady*, still goes well beyond what *Hamdi* anticipated.  *See* 542 U.S. at 528, 532. Third, there is no constitutionally-based requirement for discovery in habeas cases *at all*, much less a constitutionally-based requirement for *Brady* type disclosures (which after all was developed well after 1789).  And, as we explained, the *Brady* obligation stems from the Fifth Amendment's due process obligations in domestic *criminal* cases; it has no application either to habeas cases or to these petitioners.

Petitioners' proposal is also breathtakingly overbroad and burdensome. While the Government has no quarrel with providing evidence that is truly "exculpatory," in the sense that it tends materially to undermine information presented in the return to support the petitioner's classification as an enemy combatant, it should only provide that evidence when it is encountered in developing the returns by the attorneys preparing them (including the Department of Justice attorneys assigned to the case and those Department of Defense attorneys working on the case with them). The Government cannot and should not be forced to conduct open-ended searches for such material. As we explained, such a search is not constitutionally required because no *Brady* obligation attaches in the context of these civil habeas proceedings in wartime. Further, such a search is not relevant to the core function of habeas identified by *Boumediene*, *i.e.*, giving a *petitioner* the opportunity to make his own factual showing with his own evidence. Such a search obligation is also contrary to *Hamdi*, where the "quite extensive discovery" of criminal proceedings was rejected. 542 U.S. at 528. Finally, such an approach would be extraordinarily burdensome in a time of ongoing war. The United States military and our intelligence agencies cannot be required to devote almost limitless resources in a time of war to literally hundreds of worldwide evidentiary fishing expeditions.

While petitioners' proposed order is overbroad in that it calls for the disclosure of "all" evidence "in [the Government's] possession" without any limitation, their argument supports only a much narrower obligation more closely akin to what the Government proposes to do voluntarily, namely, to provide qualifying evidence that is *encountered in developing the returns by the attorneys preparing them*. Thus, petitioners urge that they will not "send the government on a 'fishing expedition.'" Pets' Br. at 24. But a search for information beyond what the attorneys preparing the returns encounter in preparing them would be just such a fishing expedition. Additionally, petitioners point out that their proposal will not be burdensome

- 21 -

because the Government "stated it intended to review government files" to update returns. That

is true, but this "review of government files" will be conducted by the attorneys who are

preparing the returns.

Petitioners argue that a mandatory *Brady* obligation is appropriate here given the

"'considerable risk of error' inherent in CSRTs determinations." Pets' Br. at 23 (quoting

*Boumediene*, 128 S. Ct. at 2270). But this "risk of error" is what led the Supreme Court to hold

that a petitioner must be able to make *his own showing* to the habeas court; the *Boumediene*

Court did not consider, nor did it remotely suggest, that a mandatory *Brady* obligation would be

appropriate here. Instead, it rejected the procedures that accompany a "criminal trial," *id.* at

2269, and *Hamdi* expressly rejected criminal-type discovery procedures. 542 U.S. at 528, 532-

33. In sum, because there is no *Brady* obligation in this context, the Court cannot create one and

impose it on the Government.

## III.    IN THE NORMAL COURSE, THE FACTS SHOULD BE RESOLVED BASED UPON THE WRITTEN RECORD.

### A.    Evidentiary Hearings Should Occur Only Rarely.

As we explained in our opening brief, evidentiary hearings, if they occur at all, should

occur only rarely. First, there is no constitutional entitlement to such a hearing in these

circumstances and there is nothing unusual about resolving habeas cases based upon the written

submissions. Second, neither *Hamdi* nor *Boumediene* suggested that a testimonial hearing would

be appropriate or required in these circumstances. Instead, *Hamdi* makes clear that evidentiary

hearings with live testimony would be improper. *See* 542 U.S. at 531-32 (soldiers should not be

distracted from "the serious work of waging battle" to provide eyewitness accounts of actions

that occurred half a world away). Third, routine hearings would make it all but impossible to

resolve these cases promptly. Accordingly, an evidentiary hearing would be appropriate, if at

all, only after the Court has reviewed the parties' written submissions and only once a court determines that, absent an evidentiary hearing, the weight of the evidence supports the habeas petitioner. *See* Gov. Br. at 32-33.

Petitioners' proposal, on the other hand, calls for testimonial hearings to be routine – to be held in all cases where there is any disputed issue of material fact. Such an approach does not square with the *Hamdi* burden-shifting approach, which requires that a petitioner first rebut the Government's credible evidence with "more persuasive evidence" of noncombatancy. *Hamdi*, 542 U.S. at 534. Thus, prior to *any* additional factfinding (and *well before* an evidentiary hearing is required), a petitioner must furnish evidence that is more persuasive than the Government's evidence – he cannot merely assert that there is a factual dispute or rest upon a general denial. If the evidence submitted by a petitioner is *not* more persuasive, the court must resolve the facts in favor of the Government's showing under *Hamdi without* holding an evidentiary hearing, and instead move on to any legal challenges raised by the petitioner. Petitioners' approach, by contrast, is even inconsistent with statutory habeas standards outside of the context of wartime detention. 28 U.S.C. § 2243 (court authorized by habeas statute to "summarily hear and determine the facts, and dispose of the matter as law and justice require").

**B.    The Confrontation Clause Does Not Apply and Compulsory Process Is Unavailable**

Petitioners urge that the baseline assumption will be a right to cross-examine witnesses and have the Court compel attendance of live witnesses at hearing and order depositions for those outside of this jurisdiction under Federal Rule of Civil Procedure 45. *See* Pet. Br. at 33.[8]

---

[8] The Rule 45 process itself is wholly inappropriate as a procedural framework mechanism. Under Rule 45, a petitioner could obtain a subpoena compelling a witness presence and perhaps documents merely by issuing a subpoena and without any court approval. It would then place the burden on the Government to object. This is the exact opposite of the proper baseline even in statutory habeas proceedings, where court approval for any discovery request is required.

The Supreme Court in *Harris* expressly rejected the notion that the federal discovery rules applied even in statutory habeas cases. *Harris v. Nelson*, 394 U.S. 286, 292-98 (1969). And, of course, given that the Federal Rules of Civil Procedure are limited in their application to statutory habeas cases, *see* Fed. R. Civ. P. 81(a)(2), their application to constitutional habeas cases is limited to that minimum of process required by the Constitution itself. Petitioners also assert that the baseline right to confrontation exists by relying principally upon cases where a *constitutional* right to confrontation applied due to the Sixth Amendment. That is clearly wrong because the Sixth Amendment simply does not apply outside of criminal cases. *See* Govt. Br. at 35. As to petitioners' assertion that the right of confrontation has been adopted outside of the criminal context in some circumstances, *see* Pets' Br. at 34, those cases all rest on Fifth or Fourteenth Amendment Due Process Clauses. But we have explained, the Fifth Amendment has no application (or reduced application) to aliens held outside the United States; and, in any event, our proposed procedures are consistent with the Fifth Amendment as construed in *Hamdi*.

Aside from asking the Court to adopt as a baseline the right to confrontation and compel the attendance of witnesses, petitioners posit that "particular considerations . . . are not amenable to common preliminary decision." *Id*. at 34. To be sure, the precise factual situations presented by the detainee cases may vary. But that is no reason not to set down a baseline procedure that we have suggested, and permit petitioners to argue whether, based on specific reasons, that it be modified. With regard to confrontation, it is plain, for the reasons we identified, that as a general rule no such confrontation or cross examination rights should exist. In addition, prior to arguing that some exception should apply in a particular case (and consistent with a prudent and incremental approach), other means should be employed prior to any confrontation or cross examination. For example, interrogatories or depositions by written questions might be appropriate, but only if a petitioner has exhausted other options.

Finally, as to the assertion that a petitioner should be permitted to argue that evidence be excluded, *see* Pet. Br. at 35, the Court must reject this invitation. While petitioners should be free to argue that particular evidence should be given less weight by the Court, a categorical right to exclude evidence is wholly improper. In short, while exclusionary rules might be appropriate for criminal proceedings, they do not apply to the conduct of a war. The Government has a right under *Hamdi* to justify detention based upon information about a detainee's capture made by "a knowledgeable affiant" who would "summarize [the Government's] records." *Hamdi*, 542 U.S. at 534. Nothing in *Hamdi* or any other authority compels the exclusion of information from the factual return.

**C.     Hearsay Is Admissible In These Proceedings.**

While resisting a uniform rule on the admission of hearsay, petitioners concede that it is well within the district court's discretion to admit such evidence. *See* Pet. Br. at 24-26. Thus, at most, petitioners' arguments suggest that, as the Government has argued, the real issue is the weight that this Court give hearsay evidence, rather than the mere admission of hearsay into evidence.

Petitioners' legal arguments on limiting hearsay are also not meritorious. Even in statutory habeas cases, the habeas statute specifically authorizes the taking of evidence by affidavit as well as the submission of documentary evidence, *i.e.*, the sort of hearsay that will form the core of the factual submissions in these cases. 28 U.S.C. §§ 2246-47. Thus, petitioners' insistence upon the application of limitations on hearsay in the Federal Rules of Evidence must be rejected. *See* Federal Rule of Evidence 1101(e) (Federal Rules of Evidence apply in statutory habeas proceedings only "to the extent that matters of evidence are not provided for in the statutes which govern procedure therein"). Moreover, because these proceedings are brought under the Constitution rather than under § 2241, section 1101(e) does

- 25 -

not incorporate the evidence rules at all. *Id.* (incorporating evidence rules only "[i]n the following [listed] proceedings").

Petitioners' proposal to limit hearsay to that provided by the rules of evidence also cannot be reconciled with the Supreme Court's guidance addressing these habeas proceedings in *Hamdi*. The *Hamdi* Court plainly considered whether hearsay may be relied upon in these kinds of military detention habeas proceedings. In *Hamdi*, 542 U.S. at 533-34, the plurality addressed the competing interests at issue, recognizing that petitioners be afforded "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker[,]" *id.* at 533, and that this opportunity be "'appropriate to the nature of the case'" *Id.* (quoting *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 542 (1985)). But these habeas proceedings must also, because of "the exigencies of the circumstances," "be tailored to alleviate their uncommon potential to burden the Executive at a time of ongoing military conflict" and, thus "[h]earsay, for example, may need to be accepted as the most reliable available evidence from the Government in such a proceeding." *Id.* at 533-34.

Notwithstanding *Hamdi*'s plain language and its logic, petitioners insist that "the plurality's comment should be viewed merely as acknowledging that the district court has discretion to admit affidavits under 28 U.S.C. § 2246 or other hearsay under Rules 803 through 807 of the Federal Rules of Evidence." Pet. Br. at 26. This cannot be reconciled with the fundamental reasoning of *Hamdi*, which tailored proceedings to address the unique burden of *these very circumstances*. If the *Hamdi* plurality had intended that the Federal Rules of Evidence were to apply to these proceedings, it would have mentioned the rules. *Hamdi*, 542 U.S. at 533-34. Indeed, petitioners' interpretation of *Hamdi* effectively reads out the controlling plurality's understanding that these proceedings need to be "tailored" to account for the Government's recognized interests and the plurality's acknowledgment that hearsay is not only admissible, but

may be "*the most reliable*" evidence. The plurality's recognition that hearsay may be the *most* reliable evidence relied upon establishes that it contemplated a framework outside of the Federal Rules of Evidence.[9]

While styled as challenges to the admissibility of hearsay, petitioners' arguments, in fact, go to the issue of the weight the Court should grant such evidence. Thus, petitioners ask the Court to consider liberty interests, the alleged risk of error, and national security considerations, Pet. Br. at 27-28, but these go to weighing the evidence, not whether it should be received. *See, e.g.*, *Harter v. United States*, 871 F.2d 1140, 1143-44 (D.C. Cir. 1989). Likewise, petitioners propose that the Court "must assess the reliability of the source and to determine that the information presented is credible," Pet. Br. at 28-30,[10] which is, of course, unnecessary as the Court is fully capable of making these assessments *after* this evidence is accepted.[11] In any

---

[9]Indeed, "centuries of legal experience[,]" Pet Br. at 24, reflect that the common law exceptions to the hearsay rule have been borne out of prudential considerations similar to those at issue here. In fact, the primary impetus behind the most common hearsay exceptions has been the judiciary's recognition that it is simply too burdensome or impractical to call a live witness to testify. For example, the exception for documents created by public officials, *see* Fed. R. Evid. 803(8), arose out of criteria at play in these habeas proceedings, the "presumption of a proper performance of official duty," the "great likelihood that a public official would have no memory at all respecting his action," and the "inconvenience of calling to the witness stand . . . government officers." *Wong Wing Foo v. McGrath*, 196 F.2d 120, 123 (9th Cir. 1952). The "uncommon potential to burden the Executive at a time of ongoing military conflict," *Hamdi*, 542 U.S. at 533, such as, for example, detailing by a person with first hand knowledge relating to the capture of a detainee outside of the United States or a variety of Government records, provides a more compelling reason to provide for an exception to hearsay than to alleviate the burdens placed upon private businesses and public officials. *See id.* at 538-39 ("We anticipate that a District Court would proceed with the caution that we have indicated is necessary in this setting, engaging in a factfinding process that is both prudent and incremental.").

[10] Petitioners' reliance on *Parhat v. Gates*, 2008 WL 2576977 (2008), is inapt. Whatever may be necessary to establish the reliability of evidence, *Parhat* had nothing to do with its admissibility, under the CSRT rules at issue there or (even more obviously) under the appropriate standards for wartime constitutional proceedings.

[11] Because these issues are before judges, and not juries, the concern over hearsay is clearly diminished regardless of these arguments. *See Cobell v. Norton*, 224 F.R.D. 1, 5 (D.D.C.

event, credibility determinations are a matter of weight not admissibility. *See, e.g.*, *United States v. Hamilton*, 334 F.3d 170, 186-87 (2d Cir. 2003) (credibility of hearsay declarant "goes to the evidence's weight rather than to its admissibility."). Finally, petitioners urge that the Court must consider "materiality of the evidence to be presented by the affidavit, the reliability of the evidence, and whether it relates to a disputed factual issue in this case." Pet. Br. at 31. Not only do these factors go to the issue of weight, which may need to be resolved in a case by case basis, with a presumption of validity in favor of the Government's evidence pursuant to *Hamdi*, this approach of potentially excluding evidence is contrary to *Hamdi*, which assumed that hearsay would be appropriate for the reasons that we have identified.

## CONCLUSION

For the foregoing reasons and the reasons provided in the Government's opening brief, we respectfully request that the Court enter the Government's proposed case management order.

Dated: August 1, 2008                    Respectfully submitted,

                                         GREGORY G. KATSAS
                                         Assistant Attorney General

                                         JOHN C. O'QUINN
                                         Deputy Assistant Attorney General


                                          _/s/ August E. Flentje_____

                                         JOSEPH H. HUNT (D.C. Bar No. 431134)
                                         VINCENT M. GARVEY (D.C. Bar No. 127191)
                                         JUDRY L. SUBAR (D.C. Bar No. 347518)
                                         TERRY M. HENRY
                                         AUGUST E. FLENTJE

---

2004) ("[i]n civil bench trials, . . . many experienced judges admit hearsay they deem reasonably reliable and probative, either 'for what it is worth' or on some more explicit rejection of the hearsay rule and its some 30 exceptions.").

ALEXANDER K. HAAS
WILLIAM KANELLIS
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel:  (202) 514-1278
Fax:  (202) 514-7964
Attorneys for Respondents